OPINION OF THE COURT
SCIRICA, Circuit Judge.
This securities appeal arises from the acquisition of Rockefeller Center Properties, Inc. by a group of investors led by Whitehall Street Real Estate Limited Partnership V. Plaintiffs are former Rockefeller Center Properties, Inc. shareholders who allege the proxy statement and other documents prepared in connection with the acquisition were materially misleading because they failed to disclose (1) that the Whitehall Group was negotiating to sell roughly 20% of Rockefeller Center to General Electric following the acquisition and (2) that, as a result of the acquisition, the Whitehall Group would own transferable development rights (air rights) associated with Rockefeller Center.[1] The District Court granted defendants summary judgment on both claims, holding the failure to disclose such negotiations and the acquisition of development rights was not material. We will vacate and remand its grant of summary judgment on plaintiffs’ sale negotiations claim but will affirm the grant of summary judgment on the transferable development rights claim.
I.
Rockefeller Center Properties, Inc. was a real estate investment trust created in 1985 via a $750 million initial public offering of common stock. Rockefeller Center Properties, Inc. used the offering proceeds together with $550 million raised through the sale of discounted debentures to make a $1.3 billion loan to Rockefeller Center Properties and RCP Associates, two partnerships (the “Partnerships”)[2] that at the time owned most of Rockefeller Center, in midtown Manhattan. To secure the loan, Rockefeller Center Properties, Inc. re *283 ceived two mortgages on the Partnerships’ interests in Rockefeller Center.
In the fall of 1994, Rockefeller Center Properties, Inc. realized it lacked sufficient cash to make upcoming debenture payments. In order to avoid default, it signed financing agreements with Whitehall Street Real Estate Limited Partnership Y and Goldman Sachs & Co. Whitehall agreed to make a $150 million loan to Rockefeller Center Properties, Inc. in exchange for an assignment of part of the Rockefeller Center mortgages, warrants for Rockefeller Center Properties, Inc. stock and “excess” cash. Goldman Sachs bought $75 million of Rockefeller Center Properties, Inc. debentures in exchange for a seat on Rockefeller Center Properties, Inc.’s board of directors. Goldman Sachs subsequently designated defendant Daniel M. Niedich, who served as a director until August 1995.
Rockefeller Center Properties, Inc.’s financial problems were soon compounded by the Partnerships’ financial problems. On May 11, 1995, the Partnerships filed for Chapter 11 bankruptcy and ceased making mortgage payments. ■ Realizing that without these payments it would soon be unable to meet its own financial obligations, Rockefeller Center Properties, Inc.’s board of directors began to consider recapitalization and acquisition proposals. Three groups expressed significant interest. The first group was led by Samuel Zell, a Chicago real-estate investor, and included General Electric Company, whose subsidiary the National Broadcasting Company leased approximately 20% of Rockefeller Center. The second was led by Gotham Partners, L.P., an investment firm that held 5.6% of Rockefeller Center Properties, Inc.’s shares. The third group included Whitehall Street Real Estate Limited Partnership V, Goldman Sachs & Co., Daniel M. Niedich and David Rockefeller. On August 11, 1995, Rockefeller Center Properties, Inc. entered into a combination agreement with the Zell Group, in which the Zell Group pledged a $250 million cash capital contribution plus $700 million in new financing. The agreement also contained an escape clause under which Rockefeller Center Properties, Inc. could terminate the combination plan and pursue another proposal it considered superior.
In the fall of 1995, the Partnerships filed a Chapter 11 reorganization plan in which they agreed to transfer full ownership of Rockefeller Center to Rockefeller Center Properties, Inc. Also in the fall, the Zell, Gotham and Whitehall Groups continued to submit additional proposals to Rockefeller Center Properties, Inc. In September, Rockefeller Center Properties, Inc.’s board rejected the Whitehall Group’s offer to buy out Rockefeller Center Properties, Inc. for $100 million, an amount that equaled $6.50 per share. It also rejected the Gotham Group’s $105 million rights offering proposal. But in November the board unanimously approved the Whitehall Group’s all-cash merger bid of $8.00 per share, believing this offer was superior to the Zell Group’s final bid, which contained both cash and debt components and was valued at $7.65 to $7.76 per share.[3] At about the same time, Rockefeller Center Properties, Inc., Whitehall and Goldman Sachs entered into a rights offering agreement under which Rockefeller Center Properties, Inc. would be able to make a $200 million public rights offering[4] if Rockefeller Center Properties, Inc.’s shareholders did not approve the Whitehall Group’s bid.
On February 14, 1996, Rockefeller Center Properties, Inc. filed a final proxy statement regarding the Whitehall Group’s *284 proposed merger with the SEC and distributed it to shareholders. The proxy statement represented that Rockefeller Center Properties, Inc.’s board believed the company might not remain solvent if the merger failed and explained that the rights offering might be pursued if the merger were rejected. It also stated that the board believed the rights offering, even if successful, would not allow Rockefeller Center Properties, Inc. to take ownership of Rockefeller Center. In addition, the proxy statement mentioned an appraisal valuing Rockefeller Center at $1.25 billion. The appraisal stated that this amount did not include any transferable development rights, or air rights,[5] associated with Rockefeller Center because Rockefeller Center Properties, Inc/s mortgage did not encumber those rights.
The proxy statement also contained a detailed description of the Whitehall Group’s plans if the merger were approved. It stated that the Whitehall Group would take title to Rockefeller Center and raise at least $430 million in debt financing, part of which would be used to repay Rockefeller Center Properties, Inc.’s existing debt.
In addition, the proxy statement contained references to possible “credit lease financing” transactions with General Electric. Specifically, it described a September 1995 transaction in which Rockefeller Center Properties, Inc., General Electric and a Zell affiliate agreed to modify NBC’s lease so that Rockefeller Center Properties, Inc. could obtain credit lease financing[6] and referred to the February 1996 Schedule 13E-3 in which Rockefeller Center Properties, Inc. reported this transaction with the SEC. The possibility of a lease modification was also briefly mentioned in documents presented to Rockefeller Center Properties, Inc.’s board by the company’s financial advisors and later filed with the SEC. Finally, the proxy statement mentioned the possibility of “a credit lease financing arrangement relating to a lease from, or guaranteed by, GE” in connection with the rights offering. It does not appear that the proxy statement mentioned whether the Whitehall Group contemplated pursuing a lease financing with NBC, General Electric or anyone else.
Accompanying the proxy statement were a letter signed by Rockefeller Center Properties, Inc.’s president and its chairman of the board as well as a letter from the board. The first letter described the rights offering agreement, stating that Rockefeller Center Properties, Inc. had not decided whether it would pursue such an offering if the merger failed. The second letter stated that the board had unanimously approved the merger.
On March 25, 1996, Rockefeller Center Properties, Inc.’s shareholders approved the merger. Soon thereafter, the Bankruptcy Court approved the Partnerships’ reorganization plan, which transferred *285 Rockefeller Center to the Whitehall Group.
On April 23, 1996, Rockefeller Center Properties, Inc. agreed to sell General Electric the property subject to the NBC lease for $440 million, an amount defendants claim was equal to the present value of the future payments due under the lease. A May 6, 1996 Wall Street Journal article describing the sale mentioned that General Electric and NBC had been considering this transaction for over two years. In a June 6, 1996 New York Daily News article, an NBC executive vice president stated- that NBC began thinking about the transaction in 1995.
II.
Plaintiffs filed suit on November 15, 1996, claiming that defendants violated Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78áa et seq., and SEC rules promulgated thereunder through misstatements and omissions in connection with their acquisition of Rockefeller Center Properties, Inc. Plaintiffs made essentially four allegations, two of which they raise on appeal: first, that defendants failed to disclose the Whitehall Group’s intention to sell a portion of Rockefeller Center to General Electric, and second, that defendants failed to disclose the existence of the air rights and the fact that the Whitehall Group would acquire them if its merger bid were approved.[7]
On April 30, 1997, defendants filed a motion to dismiss, supporting this motion with an affidavit containing, inter alia, a 1994 appraisal of Rockefeller Center and newspaper articles discussing the 1995 “bidding war” for Rockefeller Center Properties, Inc. Defendants also referred to a January 1997 affidavit containing several documents Rockefeller Center Properties, Inc. had filed with the SEC. Plaintiffs responded to defendants’ motion on July 9, 1997, submitting the Form 10-K Rockefeller Center Properties, Inc. filed with the SEC in 1996, the Form 10-K the Rockefeller Center Properties Trust- filed in 1997, two bankruptcy disclosure statements filed by the Partnerships and a transcript from the Partnerships’ bankruptcy hearings.
On October 7, 1997, the court heard argument on the motion to dismiss. Following argument, plaintiffs submitted a letter from Winthrop, Stimson, Putnam & Roberts, a New York law firm, to the New York City Planning Commission regarding the Rockefeller Center air rights. Later, plaintiffs also submitted two newspaper articles “discussing the interest of several parties in Rockefeller Center.”
The District Court issued its ruling on December 7, 1997. Because the court had considered “affidavits and other evidence submitted by the parties,” it converted the motion to dismiss into a motion for summary judgment under Rule 12(b). The District Court granted defendants summary judgment with respect to the General Electric sale negotiations claim. After suggesting that defendants’ disclosure may have been sufficient, the court observed that “[pjlaintiffs offer no proof that defendants knew of the details of [the General Electric] transaction at the time of the Proxy Statement or the shareholder vote.” But the court decided it need not resolve either issue because it concluded the General Electric transaction was not materially different from the potential lease financing disclosed in the proxy statement. It reasoned that 'because both a sale and a lease financing provide an “immediate source of cash,” they are economically identical. It added that because General Electric’s general interest in Rockefeller *286 Center was “well-known,” the details of the potential transaction were not material. Finally, the court noted that General Electric was a rival bidder but did not offer more than the Whitehall Group, a fact which suggested to the court that no reasonable shareholder would have considered the potential sale of part of Rockefeller Center important in deciding how to vote on the merger.
The District Court refused to grant defendants summary judgment on plaintiffs’ transferable development rights (air rights) claim. Finding the proxy statement did not disclose that Rockefeller Center Properties, Inc. would acquire the air rights when it acquired Rockefeller Center, the court then examined whether this omission was material. The court determined it could not conclude the air rights were immaterial because it had no evidence to support defendants’ claims that the air rights were either impossible to value or of minimal value.
On December 23, 1997, plaintiffs moved for reargument or, in the alternative, for certification for interlocutory appeal, claiming the District Court had improperly converted the motion to dismiss into a motion for summary judgment. They also filed a Rule 56(f) affidavit documenting their need for discovery. On March 4, 1998, defendants moved for summary judgment on plaintiffs’ air rights claim. They supported this motion with affidavits from Robert Von Aneken, a real estate appraiser who had appraised Rockefeller Center in 1994, and Norman Marcus, former general counsel to the New York City Planning Commission and author of many laws governing air rights. Von Aneken explained his appraisal of Rockefeller Center had ascribed no value to the air rights because the “possibility they would be sold for value was too remote and speculative.” He added that only one site — Rockefeller Plaza West — could feasibly make use of the air rights and explained that Rockefeller Plaza West could obtain air rights from a number of properties other than Rockefeller Center. Based on these facts, Von Aneken stated the air rights were worth at most $8.5 million. Marcus agreed that Rockefeller Plaza West was the only practical receiving site for the air rights.
Plaintiffs responded with three declarations of their own. Michael Ryngaert, a professor of finance and former senior economist at the SEC, explained the air rights could be valued using methods employed to price stock options and concluded the omission of the air rights and the sale negotiations with NBC were, when combined, materially misleading. Mary Beach, a former senior associate director with the SEC, agreed with Ryngaert’s assessment. Peter Korpacz, a real estate appraiser, valued the air rights at “at least $30 million” and disputed Von Aneken and Marcus’s conclusion that a number of sites could transfer air rights to Rockefeller Plaza West.
On July 10, the District Court declined to reverse its decision to convert the motion to dismiss into a motion for summary judgment. The District Court also rejected plaintiffs’ claim they had not received notice of conversion as required by Rule 12(b) and Rose v. Bartle, 871 F.2d 331, 340 (3d Cir.1989), although without explanation. The court then granted defendants’ motion for summary judgment on the air rights claim. After reviewing all the evidence, the court observed the highest value assigned to the air rights was a newspaper article’s $42 million estimate. The court stated that even this number was small when compared to Rockefeller Center’s $1.2 billion value and therefore concluded that “no reasonable trier of fact would conclude [the failure to mention the air rights was] a material omission.”
This appeal followed.
III.
Because the plaintiffs asserted claims under the Securities Exchange Act of 1934, the District Court had federal question jurisdiction under 15 U.S.C. § 78aa *287 and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.
IV.
There are two issues on appeal: whether the District Court’s conversion of the motion to dismiss.was proper with respect to plaintiffs’ General Electric negotiations claim[8] and whether the District Court correctly concluded the failure to disclose that the Whitehall Group would acquire Rockefeller Center’s transferable development rights (air rights) was not material. Both issues are subject to plenary review. See Ford Motor Co. v. Summit Motor Prods. Inc., 930 F.2d 277, 284 (3d Cir.1991) (plenary review on decision to convert); In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 (3d Cir.1996) (plenary review on a grant of summary judgment).
A. Conversion
1.
Fed.R.Civ.P. 12(b) provides that if on a 12(b)(6) motion to dismiss
matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment as provided in Rule 56, and all parties shall be given reasonable opportunity to present all .material made pertinent to such a motion by Rule 56.
The process of treating a motion to dismiss as a motion for summary judgment is known as “conversion.” When reviewing a District Court’s decision to convert a motion to dismiss into a motion for summary judgment, we typically examine three issues: first, whether the materials submitted require conversion; second, whether the parties had adequate notice of the district court’s intention to convert; and third, if the .parties did not have notice, whether the court’s failure to provide notice was harmless error. See Rose v. Bartie, 871 F.2d 331 (3d Cir.1989).[9]
Although the plain language of Rule 12(b) seems to require conversion whenever a district court considers materials outside the pleadings, we and other courts of appeals have held that a court may consider certain narrowly defined types of material without converting the motion to dismiss. In In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir.1997), we held that a court can consider a “ ‘document integral to or explicitly relied upon in the complaint.’ ” Burlington, 114 F.3d at 1426 (quoting Shaiu v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir.1996)). And in PBGC v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993), we decided that a district court may examine an “un-disputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiffs claims are based on the document.” The rationale for these exceptions is that “the' primary problem raised by looking to documents outside the complaint — lack of notice to the plaintiff— is dissipated ‘[wjhere plaintiff has actual notice ... and has relied upon these documents in framing the complaint.’ ” See Burlington, 114 F.3d at 1426 (quoting Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir.1993)).[10]
When a District Court decides to convert a motion to dismiss into a motion for *288 summary judgment, it must provide the parties “reasonable opportunity” to present all material relevant to a summary judgment motion. Fed.R.Civ.P. 12(b). The parties can take advantage of this opportunity only if they have “notice of the conversion.” Rose v. Bartle, 871 F.2d 331, 340 (3d Cir.1989). In Rose, we held that notice must be “unambiguous” and must “fairly apprise[ ]” the parties that the court intends to convert the motion. Id. at 341-42. We acknowledged that notice need not be express to meet these standards but recommended that District Courts provide express notice when they intend to convert a motion to dismiss. See id. at 342.[11] We also suggested that notice might be provided through the court’s orders or at a hearing. See id. at 341-42. In this case, plaintiffs claim they did not learn of the court’s intention to convert the motion until it granted summary judgment.
2.
We believe the District Court did not provide adequate notice of conversion. The record contains no orders suggesting the District Court would convert the motion to dismiss. Nor did the District Court provide notice at the October 7,1997 hearing on the motion to dismiss. Rather, at the hearing the court repeatedly stated that it was deciding a motion to dismiss. See Appendix at 1254 (“If [plaintiffs] survive the motion to dismiss ....”); id. at 1273 (“I am not saying I am going to deny the motion to dismiss.”); id. at 1292 (“[I]f I ... grant the motion to dismiss .... ”); id. (speaking of defendants’ motion as “a motion to dismiss”); id. at 1294 (speculating on future proceedings if “there is a failure in the pleadings.... ”).[12]
Defendants maintain that plaintiffs had constructive notice of conversion because they chose to submit material beyond the pleadings.[13] We note that some courts of appeals have decided a party who submits material outside the pleadings is on constructive notice of conversion. See, e.g., San Pedro Hotel Co. v. City of Los Ange-les, 159 F.3d 470, 477 (9th Cir.1998) (holding that when a party submits matters outside the pleadings, he has notice conversion may occur); Collier v. City of Chicopee, 158 F.3d 601, 603 (1st Cir.1998) (same); Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 260-61 (4th Cir.1998) (same); Arnold, v. Air Midwest, Inc., 100 F.3d 857, 859 n. 2 (10th Cir.1996) (same). But at least one other circuit has required express notice of conversion. See Jones v. Automobile Ins. Co., 917 F.2d 1528, 1532-33 (11th Cir.1990) (holding that District Court must provide ten days “express notice ”). Defendants assert we adopted a constructive notice approach in Hilfirty v. Shipman, 91 F.3d 573 (3d Cir.1996), claiming that Hilfirty holds that 'a party who submits material outside the pleadings “is deemed to be on notice that the motion [to dismiss] will be converted.” We disagree. Hilfirty explicitly states that the “primary reason” notice was deemed adequate was that some of the motions to dismiss had been framed in the alternative as motions for summary judgment. Hilfirty, 91 F.3d at 578-79. Because defendants’ motion to dismiss here was not framed in the alternative as a *289 motion for summary judgment, we think Hilfirty is inapposite. In addition, the District Court in Hilfirty did not expressly and repeatedly state it was deciding a motion to dismiss.
3.
A district court’s failure to provide notice compels reversal unless the failure is harmless error. See Rose at 342. Failure to provide notice is harmless error if the plaintiffs complaint would not have survived a motion to dismiss. See id. In this ease the motion to dismiss must be informed by the pleading standards of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 et seq. In the past, we have applied the harmless error analysis where we determined the parties did not have notice of conversion. See Rose v. Bartle, 871 F.2d 331 (3d Cir.1989), Hancock Industries v. Schaeffer, 811 F.2d 225 (3d Cir.1987); Davis Elliott International, Inc. v. Pan American Container Corp., 705 F.2d 705 (3d Cir.1983). In each case, we were able to determine the propriety of dismissal by applying established law to relatively straightforward allegations in the complaint. Although material beyond the pleadings had been submitted, it does not appear to have been voluminous or to have raised complex issues of pleading.
When appropriate, a court of appeals may decide a motion to dismiss even after conversion. But in cases like this one, involving complex principles of law and voluminous materials (an 1800-page Appendix), the District Court, which is familiar with the record, is better suited for this task in the first instance. Furthermore, the motion to dismiss here involves interpreting a recently-enacted law—the Private Securities Litigation Reform Act—whose scope is still being defined. In addition, the parties briefed and argued their cases prior to oui recent decision in In re Advanta Corporation Securities Litigation, 180 F.3d 525 (3d Cir.1999), setting forth the pleading standard under section 78u-4(b)(2) of the Reform Act. We believe the wiser course is to vacate the grant of summary judgment on this claim and remand so the parties have the opportunity to frame their arguments in light of this opinion and Advanta.
For these reasons, we will vacate and remand the District Court’s grant of summary judgment on plaintiffs’ General Electric sale negotiations claim.
B. Transferable Development Rights (Air Rights)
Plaintiffs assert that the failure to disclose the existence and value of the air rights was a “material omission” violating Rules 10b-5 and 14a-9.[14] An omitted fact is immaterial unless “there is a substantial likelihood that a reasonable shareholder would consider .it important in deciding how to vote,” TSC Indus., Inc. v. Nortway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and unless its “disclosure ... would have been viewed by the reasonable shareholder as having significantly altered the ‘total mix’ of information made available.” Id. In In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427 (3d Cir.1997), we held an omission is immaterial as a matter of law if the facts omitted “would have had no more than a negligible impact on a reasonable *290 investor’s prediction of the firm’s future earnings.” In determining the effect of an omission, we examine whether the information omitted is speculative or unreliable, see In re Craftmatic Sec. Litig., 890 F.2d 628, 644 (3d Cir.1989), or if it is contingent. See Lewis v. Chrysler Corp., 949 F.2d 644, 652-53 (3d Cir.1991). These considerations are especially relevant when the information omitted is “soft” information, a term which includes statements such as estimates and appraisals. See Craftmatic, 890 F.2d at 642-43.
Plaintiffs claim the District Court erred in determining the materiality of the air rights by comparing their value to the value of Rockefeller Center. Asserting that knowledge of the air rights and their value would have been important to a reasonable shareholder’s decision on whether to vote for the merger, plaintiffs note their expert appraised the air rights at “at least $30 million” and that defendants had promised to pay shareholders $308 million to complete the merger. From these facts they contend a reasonable shareholder would have determined that defendants should have paid shareholders $30 million more. (This $30 million breaks down to nearly eighty cents per share — roughly ten percent of price proposed by the Whitehall Group.)
Defendants offer three reasons we should affirm the District Court’s grant of summary judgment on the air rights issue. First, they claim that Rockefeller Plaza West — the only practical receiving site for the air rights — has recently been developed without any air rights, which in their eyes “prove[s] conclusively” the air rights never had any value. Second, they contend they did disclose the Whitehall Group would acquire the air rights through the acquisition of Rockefeller Center Properties, Inc.; specifically, that Rockefeller Center Properties, Inc. documents filed with the SEC disclosed that Rockefeller Center had air rights and the Proxy Statement disclosed that the Whitehall Group would acquire Rockefeller Center through the acquisition. They contend these documents disclosed the impending transfer of the air rights because “Rockefeller Center” “naturally includes” the air rights associated with it. Finally, defendants maintain the air rights were immaterial because their sale was contingent and speculative and even the $30 million value proffered by plaintiffs was negligible compared to Rockefeller Center’s $1.2 billion value and would have played no role in the reasonable shareholder’s voting decision.
We need not decide whether $30 million is material when compared either to the $1.2 billion value of Rockefeller Center or to the $308 million plaintiffs received from the Whitehall Group because plaintiffs have provided no evidence the air rights would be sold, that the Whitehall Group planned to sell them or that one of the possible receiving sites had expressed any interest in acquiring them at any point in the future. Without such evidence, the value shareholders (as opposed to appraisers) would attach to the air rights is contingent and speculative, which weighs against a finding of materiality. In addition, full disclosure of the air rights would have mentioned not only their possible value but also the limited prospect they would ever be sold. For these reasons, we do not think disclosure of the air rights would have been important to a reasonable shareholder’s voting decision. Therefore we will affirm the District Court’s grant of summary judgment on plaintiffs’ air rights claims.
V.
For these reasons, we will vacate and remand the District Court’s grant of summary judgment on plaintiffs’ General Electric sale negotiations claim but will affirm its grant of summary judgment on their air rights claim. We will remand for proceedings consistent with this opinion.

. Defendants include some members of the Whitehall Group, some of their affiliates and former officers and directors of Rockefeller Center Properties, Inc.

. The partnerships were owned by The Rockefeller Group, Inc. ("RGI"), which was in turn owned by the Mitsubishi Estate Co. of Japan and Rockefeller family trusts.

. The Whitehall Group's $8.00 per share bid appears to represent a 50% premium over the price of Rockefeller Center Properties, Inc. stock before the bidding for Rockefeller Center Properties, Inc. began.

. In a rights offering, an issuer’s existing shareholders “are granted the opportunity (i.e., right) to purchase [a] new offering of shares, usually at a discount below their current market price."See JAMES D. COX ET AL„ SECURITIES REGULATION 217 (2d ed.1997).

. In New York City, a real property owner who acquires air rights from another property can develop his own property beyond the limits zoning laws would otherwise impose. Air rights are created when "owners of real property [do] not develop[ ] their property to the full extent” allowed by the zoning laws. Penn Central Transp. Co. v. New York City, 438 U.S. 104, 113-14, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Air rights associated with a property designated as a landmark — as Rockefeller Center is — have a limited number of possible purchasers: the rights may be transferred only to directly adjacent lots within the same block, lots directly across the street and any lot that is part of a chain of lots under common ownership with the landmark and separated from the landmark only by streets.

. A credit lease financing is a form of asset securitization in which the right to receive future lease payments is sold for the present value of those payments. See RICHARD R. GOLDBERG, "Commercial Real Estate Secu-ritization: Capital Markets Financing for Debt and Equity,” 2 MODERN REAL ESTATE TRANSACTIONS 1745 (11th ed.). For-an overview of asset securitization, see generally Steven L. Schwarcz, The Alchemy of Asset Securitization, 1 STAN. T.L. BUS. & FIN. 133 (1994).

. In District Court, plaintiffs also claimed that defendants failed to disclose the interest of certain companies in leasing property at Rockefeller Center at “premium rates” and alleged that defendants “understated the potential alternatives to the merger” with the Whitehall Group. The District Court granted defendants summary judgment on these claims because it concluded the misstatements or omissions plaintiffs alleged were not material. These claims have not been raised on appeal.

. The propriety of conversion with respect to the air rights claims is not at issue. The District Court did not grant summary judgment on those claims as the result of conversion but because of defendants’ motion for summary judgment.

. For a comprehensive discussion of conversion, see 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (2d ed. 1990 & Supp.1999).

.For an analysis of materials courts consider on 12(b)(6) motions, see Kurds A. Kemper, Annotation, What Matters Not Contained in the Pleadings May Be Considered in Ruling on a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or Motion for Judgment on the Pleadings Under Rule 12(c) Without Conversion to Motion for Summary Judgment, 138 A.L.R. Fed. 393, 1997 WL 475158 (1997).

. We reaffirm this recommendation because express notice is easy to give and removes ambiguities.

. We also note that defendants not only failed to suggest conversion was required but instead stated the court was deciding a motion to dismiss. See id. at 1272 ("I am quoting the position on a motion to dismiss."). Defendants argue that statements made at the October 7 hearing are irrelevant to the notice issue because plaintiffs submitted material beyond the pleadings only after the hearing. But both parties submitted material beyond the pleadings before October 7; defendants alone submitted twenty-two exhibits totaling more than seven hundred pages prior to the hearing.

.For a discussion of these varying approaches, see 2 JAMES WM. MOORE ET AL„ MOORE'S FEDERAL PRACTICE ¶ 12.34 (3d ed.1999).

. Rule 10b-5, promulgated by the SEC under § 10(b), forbids the omission of "a material fact necessary in order to make ... statements made ... not misleading.” In order to state a 10b-5 claim based on the omission of a material fact, a plaintiff must show “that the defendant (i) made ... omissions; (ii) of material fact; (iii) with scienter; (iv) in connection with the purchase or sale of securities; (v) upon which the plaintiff relied; and (vi) that reliance proximately caused the plaintiff’s injury.” In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir.1989).
Rule 14a-9, promulgated by the SEC under § 14(a), prohibits the solicitation of proxies by means of a proxy statement that contains a statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false' or misleading.”