NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3528
_____

MICHAEL TUNO; WORLD CLASS DEALER SERVICES,

Appellants

v.

NWC WARRANTY CORPORATION;
NWC ADMINISTRATION INCORPORATED;
NATIONAL WARRANTY CORPORATION; DIANA HAGMAIER
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-11-03958)
Honorable Stewart Dalzell, District Judge
_____

Submitted under Third Circuit LAR 34.1(a)
March 24, 2014

BEFORE: FUENTES, GREENBERG, and VAN ANTWERPEN, <u>Circuit</u> <u>Judges</u>

(Filed: April 3, 2014)
_____

OPINION OF THE COURT
_____


GREENBERG, <u>Circuit</u> <u>Judge</u>.

Plaintiffs-appellants Michael Tuno and his company, World Class Dealer Services

(together "Tuno"), appeal from two orders that the District Court entered in accordance

with the Court's detailed opinions ruling on three separate motions in this action that Tuno brought against defendants-appellees NWC Warranty Corporation, NWC Administration, Inc., and National Warranty Corporation (collectively "NWC") and Diana Hagmaier, NWC's owner and chief executive officer. See Tuno v. NWC Warranty Corp., No. 11-3958, 2013 WL 3939487 (E.D.Pa. July 31, 2013).[1] The action involves NWC's business, in which Tuno served as its agent, of issuing supplemental automobile warranties, service contracts, and supplemental insurance coverage to purchasers of automobiles. Although the end consumers of NWC's products were automobile purchasers, Tuno dealt primarily with automobile dealers who marketed NWC's products to the automobile purchasers. Tuno and the dealers received their compensation from commissions that NWC paid on the sales. Though NWC usually issued the checks to the automobile purchasers to pay approved claims, for the most part its underwriters, in particular Great American Insurance Group during the period involved in this action, paid the approved claims by reimbursing NWC for the payments that it had made.

Tuno's principal complaint against NWC is that it failed to make payments to automobile purchasers on claims due on its obligations. When NWC did not make these payments, Tuno paid some of them himself. In this action, he is seeking reimbursement for those payments as well as a recovery for other damages that he claims to have suffered because of NWC's actions. At first NWC moved to dismiss a portion of Tuno's action and later it moved for summary judgment on the balance of the action. The District Court entered orders that partially dismissed the complaint and granted the

_____

[1] In this opinion when we refer to NWC, we include Hagmaier.

2

motion for summary judgment and Tuno appeals from those orders. At the time that NWC moved for summary judgment, Tuno moved for an order compelling NWC to produce certain documents that he believed could aid his case. The Court denied that motion and Tuno also appeals from that order.

As we have indicated, during the relevant time period Tuno served as NWC's agent in the sale of its products. Tuno and NWC established their relationship in an uncomplicated agreement into which they entered in 2005 entitled "NWC Administration, Inc. Agency Agreement." From 2006 to 2010, Tuno marketed NWC's products to automobile dealers in Pennsylvania and New Jersey; consumers buying automobiles at participating dealerships could obtain NWC's products when they bought their automobiles. When automobile purchasers made claims they went through the dealers from whom they purchased the automobiles. The dealer, in turn, forwarded the claim for processing and payment to NWC. When NWC received a claim, a NWC claims manager reviewed the claim and decided if NWC should pay it.[2]

The agreement between Tuno and NWC defined Tuno's responsibilities, specified how he would be compensated, and set forth the circumstances in which either party could terminate the agency. The agreement, however, did not indicate the obligations that NWC owed to the automobile purchasers, the consumers of its products.

---

[2] Inasmuch as NWC sought reimbursement from its underwriter for payments that it made, the claims manager before acting on a claim sometimes would ask the underwriter for its opinion as to the legitimacy of the claim. The underwriter's preapproval for payment of claims, however, generally was not required and was not obtained.

Tuno brought state law claims under Pennsylvania law against NWC in the District Court based on his claim that NWC breached the agency agreement and made misrepresentations to him. Tuno's complaint focused on Hagmaier's actions, and asserted that between 2007 and 2010, Hagmaier and NWC adopted a policy of routinely denying claims covered by NWC's products. Tuno asserts that Hagmaier made various fraudulent misrepresentations to him to convince him to continue selling NWC's products.

Tuno claimed direct and indirect financial injury resulting from NWC's breach of contract and the misrepresentations. As we have set forth, he claimed that NWC injured him when it withheld payments for legitimate claims because he then made payments himself on the claims, expending about $30,000 in this way. In addition, Tuno claims that NWC breached its contract with him in the ways that we discuss below. He asserts that he was injured beyond the cost to him of the payments that we have described in the following ways: loss of clients; loss of commissions from NWC (which were contractually owed to him); and the incurring of indebtedness to NWC for "cancellation chargeback fees."[3] In particular, Tuno alleged that by 2010 almost all of the dealerships that had obtained NWC contracts through him had ended their relationship with him and that the dealers who continued to work with him did so to a diminished degree.

---

[3] NWC filed a counterclaim for breach of contract and unjust enrichment by reason of Tuno not paying those fees. We need not address the counterclaim because the District Court declined to exercise supplemental jurisdiction over it and therefore dismissed it without prejudice, see 28 U.S.C. § 1367(c), and NWC has not cross-appealed from the dismissal.

Tuno bases his claims against NWC on three legal theories: (1) fraud; (2) misrepresentation; and (3) breach of contract and breach of the implied covenant of good faith and fair dealing. As we have indicated, NWC moved to dismiss the complaint and later moved for a summary judgment. In a June 12, 2012 order, the District Court partially granted and partially denied NWC's motion to dismiss. It held that Tuno's separate counts for fraud and misrepresentation constituted a single cause of action for fraudulent misrepresentation under Pennsylvania law. However, despite noting deficiencies in Tuno's pleadings and supporting brief, the Court declined to dismiss the fraudulent misrepresentation claim because it took into account allegations that Tuno made in a proposed amended complaint that went beyond his original complaint and were sufficient to survive a motion to dismiss. But the Court dismissed Tuno's breach of contract claim and, in doing so, outlined the allegations supporting each purported breach and rejected the claims because they were not tied to any damages Tuno claimed or to a particular contractual provision. Finally, the Court dismissed the good faith and fair dealing allegations as it found that they were redundant with Tuno's fraudulent misrepresentation claim. App. 14-17.[4] Consequently, after the Court entered the June 12, 2012 order, only Tuno's fraudulent misrepresentation claim survived.

With the contract-based claims dismissed and the scope of the case substantially narrowed, the District Court allowed the parties six months to complete discovery with

---

[4] The District Court also dismissed Tuno's prayer for additional relief, including for punitive damages and for attorney's fees. Tuno does not appeal from this ruling, and we will not discuss it further.

5

that period to be followed by a two-week period to submit motions for summary judgment. Though neither side asked for an extension of the discovery period, on December 6, 2012, the last day of that period, Tuno filed a motion seeking an order compelling NWC to produce certain documents that he believed could help him establish his case. NWC opposed that motion and, in accordance with the briefing schedule still in place, submitted its motion for summary judgment. On July 31, 2013, the Court denied Tuno's motion and granted NWC's motion for summary judgment dismissing Tuno's fraudulent misrepresentation claim. That order was final and appealable because it terminated the action. Tuno appeals from the District Court's orders of June 12, 2012, and July 31, 2013, as he contends that the Court erred (1) in dismissing his contract claims; (2) in granting NWC summary judgment on his fraudulent misrepresentation claim; and (3) in denying his motion to compel the production of certain documents.

The District Court had diversity of citizenship jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. We review the District Court's denial of Tuno's motion to compel discovery on an abuse of discretion standard. See Camiolo v. State Farm Fire & Cas. Co., 334 F.3d 345, 354 (3d Cir. 2003). But we apply a de novo standard of review to the Court's orders on NWC's motions to dismiss and for summary judgment. See Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 826 (3d Cir. 2011). In considering the order entered on the motion to dismiss, we accept all of Tuno's allegations in the complaint and view them in the light most favorable to him. See id.; see also Fed. R. Civ. P. 12(b)(6). Similarly, we draw inferences favorable to Tuno when viewing the evidence in our consideration of the order granting summary judgment and

6

ask whether there was any genuine dispute of material fact that barred the granting of the motion. See Barefoot Architect, 632 F.3d at 826; Fed. R. Civ. P. 56(a). The application of a de novo standard of review, however, does not require us to ignore the District Court's careful analyses of the motions to dismiss and for summary judgment. What it does require is that we not defer to the Court's conclusion. See, e.g., United States v. Rodrigues, 678 F.3d 693, 701 (9th Cir. 2012).

We first will analyze the District Court's order that dismissed Tuno's contract-based claims before addressing the Court's order granting NWC summary judgment on Tuno's fraudulent misrepresentation claim while denying Tuno's motion to compel the production of documents. The Court dismissed Tuno's claim that NWC breached its implied duty of good faith and fair dealing, finding those allegations to be redundant with the allegations underlying his fraudulent misrepresentation count. We agree with this disposition but do so for a reason distinct from that the District Court expressed as we conclude that Tuno could not maintain an action for the breach of an implied duty of good faith separate from an action for breach of his agreement with NWC. See, e.g., Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999) (observing that we may affirm a dismissal of a claim on "any ground supported by the record"). Although Pennsylvania courts have recognized "the general duty of contracting parties to perform their contractual obligations in good faith," Baker v. Lafayette College, 504 A.2d 247, 255 (Pa. Super. Ct. 1986) (citing § 205 of the Restatement (Second) of Contracts), aff'd, 532 A.2d 399 (Pa. 1987), they consistently have held that this implied duty does not create a cause of action separate from a cause of action for breach of contract. See

7

Hatchigian v. State Farm Ins. Co., No. 13-2880, 2014 WL 176585, at *7 (E.D. Pa. Jan. 16, 2014) (citing Pennsylvania's "extensive authority" for the proposition that "there is no separate cause of action for a breach of the implied covenant of good faith and fair dealing").[5]

In Pennsylvania a claim predicated on a breach of the covenant of good faith is "subsumed in a breach of contract claim." Burton v. Teleflex Inc., 707 F.3d 417, 432 (3d Cir. 2013) (quoting LSI Title Agency, Inc. v. Evaluation Servs., Inc., 951 A.2d 384, 392 (Pa. Super. Ct. 2008)). Therefore, in practice, the covenant of good faith functions "as an interpretive tool" to aid the court in evaluating breach of contract claims but the implied duty is never "divorced from specific clauses of the contract." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000).

To be sure, in limited situations Pennsylvania courts implicitly have recognized exceptions to this rule by recognizing stand-alone claims for breach of the covenant of good faith and fair dealing. Id. But Tuno's claim does not fit within that exception for, as the District Court noted, Tuno's allegations and arguments in the District Court primarily advanced the same allegations for all of his claims and we find the same to be true with respect to his claims in this Court. Indeed, Tuno concedes this point in his brief as he sets forth that "[t]he factual allegations for the breach of contract claim are essentially the same as the allegations for the fraud claim." Appellant's br. 24 n.6. Thus,

---

[5] We cite this unpublished case for its collection of authority, not for any precedential value.

8

Tuno's claim for breach of the duty of good faith cannot stand separately from his claim for breach of contract.

There is compelling precedent supporting our conclusion inasmuch as Tuno's claim based on the implied covenant of good faith is similar in a legal sense to a claim that the plaintiff advanced in Northview Motors. In Northview Motors, the plaintiff, an automobile dealer, brought various claims against the defendant, Chrysler, an automobile manufacturer, including a claim that Chrysler had breached its duty to act in good faith when it failed to send vehicles that were desirable for sales purposes to the plaintiff pursuant to the parties' franchise agreement. We determined that Pennsylvania courts would reject that common law claim as they would address only the "claim for fraud based on the same set of facts [as the claim for a breach of the implied covenant]." 227 F.3d at 92 (noting that "[s]uch an approach limits the use of the bad faith cause of action to those instances where it is essential . . . [as] the covenant of good faith necessarily is vague and amorphous"); see also Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 701 (3d Cir. 1993) (holding that plaintiff "could seek relief under an established cause of action, and there is no reason to imply a separate tort for breach of a duty of good faith").

So far as we are aware, the Pennsylvania courts have not disagreed with Northview Motors, and thus we see no reason to depart from its holding. Accordingly, because Tuno's good faith and fair dealing claim is grounded on allegations that we do not regard as being based on the agreement he entered into with NWC and are redundant with allegations underlying his misrepresentation claim, the District Court did not err in

9

dismissing the covenant of good faith part of his complaint. We thus move on to consider his breach of contract claim.

Under Pennsylvania law to sustain his breach of contract claim, Tuno needed to show that there was a contract, that NWC breached the contract, and that the breach of contract caused him damages. See McShea v. City of Philadelphia, 995 A.2d 334, 340 (Pa. 2010). Tuno's breach of contract claim that the District Court dismissed in its June 12, 2012 order asserted, inter alia, that NWC violated its agreement with Tuno by disclosing certain confidential information to the automobile dealers selling NWC's products and that it changed underwriters without timely notifying him. The District Court held that these two allegations could not sustain a breach of contract claim because Tuno did not allege that he suffered damages traceable to the purported violations. Tuno does not explain adequately why the Court's conclusion was wrong, and our independent review of the case satisfies us that the Court did not err in reaching its conclusion. We add only that, even if true, the latter claim is not predicated on a breach of the agency agreement. In reaching our conclusion we note that Tuno invokes the provision of the agency agreement that provides that his commission is determined based on the "Confidential Agent Price List" to support his breach of contract claim. Yet notwithstanding its use of that term, the language in the agreement does not prohibit the disclosure of the price list and thus NWC did not breach its contract with Tuno by disclosing the terms.

Tuno's remaining two arguments supporting his breach of contract claim fail for the same reason: he has not set forth facts that if proven at trial would demonstrate that

10

NWC violated the agency agreement. He asserts that Hagmaier "stated that NWC programs were covered by insurance, when no insurance policy actually existed," and these representatives "induced" him to "continue selling NWC's programs." Appellant's br. 23. But Tuno does not point to any contractual provision supporting this argument and, in our reading of the agreement, we have not found any such provision.

We recognize that Tuno argues that NWC "fraudulently acted to trigger" a section in the agency agreement that allowed NWC to terminate the agreement "for cause" and thus avoid paying Tuno the commissions it owed. Appellant's br. 23. At first blush, as the District Court noted, this allegation would seem to "implicate the duty of good faith and fair dealing." App. 16. Moreover, the allegation might have given Tuno a basis to have survived the motion to dismiss because, as we have explained, when tied to a particular agreement provision, the covenant of good faith can act as an interpretive tool to bolster a breach-of-contract claim.

But the allegations underpinning this argument betray Tuno's real claim. He is not actually complaining that <u>NWC</u> wrongfully terminated the agreement; instead, he claims that "NWC's fraudulent acts . . . caused <u>dealers</u> to leave NWC Programs." App. 86-87 (proposed amended complaint submitted by Tuno on opposition to the motion to dismiss, ¶ 33) (emphasis added). Tuno claims that NWC effectively terminated his agency for its actions terminated his receipt of commissions. But as far as we can tell, Tuno has not alleged or argued that NWC ever formally ended the agency agreement. As a result, to establish his claim that NWC breached their agreement he cannot rely on a provision in

11

the agreement that specifies when such termination is permissible. Accordingly, we will affirm the District Court's partial dismissal of Tuno's complaint.

As we have noted, Tuno appeals from both aspects of the District Court's order of July 31, 2013, that granted NWC summary judgment on Tuno's fraudulent misrepresentation claim and denied Tuno's motion to compel the production of documents. To prevail on a claim for fraudulent misrepresentation under Pennsylvania law, a plaintiff must establish six elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005) (quoting Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994)). And he must do so "by clear and convincing evidence." Porreco v. Porreco, 811 A.2d 566, 570 (Pa. 2002). With respect to the last element, Pennsylvania courts ask whether "a defendant's acts or omissions were a 'substantial factor' in bringing about the plaintiff's harm." Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d Cir. 2009) (quoting First v. Zem Zem Temple, 686 A.2d 18, 21 n.2 (Pa. Super. Ct. 1996)).

The District Court granted summary judgment on the fraudulent misrepresentation claim because it found that NWC did not make fraudulent misrepresentations that injured Tuno. In contending that the Court erred in granting summary judgment, Tuno largely relies on the deposition testimony of Bridget Bullion, NWC's claims manager from 2005 through 2010. Her job at

12

NWC was to decide whether a claim should be honored by checking NWC's contractual provisions relating to the claim and by obtaining necessary proof and documents supporting the claim.

Bullion testified that beginning in 2009 and continuing through the time that NWC terminated her employment, Hagmaier stopped approving about 60-75% of the claims, even when Great American or another underwriter had cleared them. As a result, Bullion began receiving complaints from automobile dealers about unpaid claims. Great American apparently became aware of the dealers' complaints, as its representatives went to NWC's office to investigate the delays and perform an audit and it subsequently dealt with some types of claims directly.

In an exchange with Tuno's counsel during her deposition, Bullion explained that when fielding calls from automobile dealers and their customers, she would say "whatever [she] needed to say or do to basically talk them off the ledge." Bullion did not want to paint Hagmaier "in a bad light." So, she began to make excuses on Hagmaier's behalf:

> I said . . . whatever I needed to . . . within some confines . . . . I might tell them that we changed our system. I might tell them that we have some new people working for us and we're a little backlogged. There was a lot of song and dance that I did . . . .

App. 232-33. Hagmaier knew about the complaints and the excuses but never told Bullion why she was not approving seemingly valid claims. Bullion later clarified that while she thought Hagmaier's "excuses were rather lame," she did not know whether Hagmaier eventually denied the claims based on exclusions in the automobile purchasers'

13

contracts or whether she ultimately approved them. When pressed, however, Bullion agreed with Tuno's counsel that Hagmaier was engaging in fraudulent practices, which to Bullion meant that Hagmaier was not "living up to [a] contract."

Tuno uses the testimony, that we quote above, focusing on the "song and dance" refrain, in an attempt to establish that NWC was guilty of misrepresentation because it was giving false explanations with respect to its failure to pay claims, and Tuno applies the song and dance refrain to several justifications that Bullion and Hagmaier made to various individuals as to why certain claims had not been approved. For instance, Tuno complains about the response that Hagmaier gave to William Messick, a purchaser of NWC's products who made a claim. Hagmaier assured Messick via email that his claim was covered but, according to Tuno, Hagmaier nevertheless refused to honor the claim. The District Court rejected this allegation because Tuno did not cite evidence supporting his assertion that NWC did not pay Messick's claim.

Tuno has not pointed us to any evidence that the District Court overlooked in its careful analysis. Instead, he argues that the Court erred in considering his allegations "separately, as if in a vacuum" and that the Court should have read them together with Bullion's testimony that Hagmaier refused to pay a majority of claims. Tuno uses this reasoning to disagree with the Court's rejection of other claims asserting that Hagmaier made misrepresentations, arguing that although "Bullion did not testify as to specific instances where she made false statements, she did testify as to her continual 'song and dance' with regard to these exact types of communications with dealers and customers." Appellant's br. 48.

14

We are not persuaded. Tuno correctly contends that as the nonmoving party he should have received the benefit of favorable inferences, but he ignores the circumstance that the clear and convincing standard would be applied at trial. Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (observing that on summary judgment, the plaintiff's burden is "commensurately high because the court must view the evidence presented in light of the [clear-and-convincing] substantive evidentiary burden at trial"). That standard "requires [a plaintiff] to provide evidence so clear, direct, weighty, and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in a way that renders them liable." Kendall v. Daily News Publ'g Co., 716 F.3d 82, 92 (3d Cir. 2013) (internal quotation marks omitted)).

Tuno could not survive the motion for summary judgment with respect to those purported misrepresentations as he has not presented evidence that the representations were false beyond Bullion's "song-and-dance" testimony. According to Bullion, Hagmaier did not raise any inappropriate issues with respect to many of the claims. And, as Bullion admitted, NWC ultimately might well have paid some claims that Hagmaier initially questioned, even if the claims had been questioned for what Bullion believes were "lame" reasons. In other words, Bullion did not testify that every justification for initial nonpayment uttered by an NWC employee was false. Consequently, to show a genuine dispute with regard to falsity, Tuno had to submit evidence bearing on particular statements. As far as we can tell from his brief, he did not do so—at least not for those representations that he claims on appeal should have been deemed false solely by reason of Bullion's "song and dance" testimony.

15

Tuno does, however, purport to offer specific proof of falsity for other NWC statements. His claim for these representations fail for the reasons provided by the District Court. For instance, he asserts that on one occasion, responding to a BMW dealer, Bullion stated that Great American was paying claims for its Tire-and-Wheel program directly, even though in a different letter she stated that NWC was still the entity responsible for administering these claims. The Court reconciled these statements by citing evidence that under a changed claim system, Great American would process claims that it insured, while NWC processed claims insured by a different underwriter. Tuno does not point to any error in that conclusion, and in our review of the evidence we have not found any error.

In one situation in which Tuno purports to offer specific evidence that a representation was false, he refers to a 2008 letter that he received from Hagmaier in which she explained that under NWC's policy, sidewall damage to a tire would be covered. Tuno asserts that this representation was inconsistent with a statement that another NWC representative made in 2010 that "any tire with sidewall damage, in any form, is not a covered loss." Appellant's br. 51. The District Court reconciled the differences in these statements by quoting Hagmaier's deposition testimony in which she explained that the coverage NWC offered for tires changed in the spring of 2008, a change that was reflected in the different forms completed by the purchasers. The Court observed that these letters showed "two different, but accurate, representations of the two different plans for coverage." Tuno, 2013 WL 3939487, at *7. Tuno does not give us a reason to disagree with this conclusion, and our independent review of the evidence leads

16

us to the same conclusion reached by the District Court, i.e., there was no basis for the fraudulent misrepresentation claim.

Tuno argues that he opposed NWC's motion for summary judgment "with both hands tied behind" his back because the District Court refused to compel NWC to produce certain documents that would reveal evidence that could support his case. Appellant's br. 52. Although Tuno was not required to show that if the Court had granted his discovery request he necessarily would have uncovered admissible evidence, Fed. R. Civ. P. 26(b)(1), he had the burden to explain why his request was not "speculative," lest he be allowed to engage in a "fishing expedition" to find some evidence to support his claim. Williams v. Beard, 637 F.3d 195, 210-11 (3d Cir. 2011). In other words, he had to show that his request was "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Applying the foregoing standard we cannot find that the District Court abused its broad discretion in denying his motion. See Sempier v. Johnson & Higgins, 45 F.3d 724, 734 (3d Cir. 1995) ("Under the Federal Rules of Civil Procedure and our jurisprudence, district courts have broad discretion to manage discovery."). In this regard, Tuno has not pointed to any flaw in the Court's conclusion that the documents he sought could not show what he thought they could show, namely that Hagmaier was diverting funds from NWC's trust account. The record supports this conclusion because Hagmaier testified that Great American was the sole signatory on the account. Therefore, the Court did not err when it did not compel NWC to produce evidence merely to test the plausibility of

17

something that appeared to be impossible. Accordingly, we affirm the Court's order denying Tuno's motion to compel.

For the foregoing reasons, we will affirm the District Court's June 12, 2012 and July 31, 2013 orders.