# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3426

_____

David Roberts

*Plaintiff - Appellee*

v.

City of Omaha, a Political Subdivision of the State of Nebraska

*Defendant - Appellant*

Omaha Police Department, an Agency of the City

*Defendant*

Josh Martinec, in his individual and official capacities; Phillip Ricker, in his individual and official capacities; Erich Jones, in his individual and official capacities; Justin Raders, in his individual and official capacities

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 14, 2013
Filed: July 31, 2013

_____

Before RILEY, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

David Roberts sued the City of Omaha (city) and four Omaha Police Department officers (officers) (collectively, defendants), alleging, among other claims, Fourth Amendment excessive force violations of 42 U.S.C. § 1983; and violations of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132; the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794; and state tort law. The district court granted in part and denied in part (1) the officers' motion for summary judgment based on qualified immunity, and (2) the city's motion for summary judgment. The defendants appeal the denial of summary judgment. Having jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine, see Lockridge v. Bd. of Trs. of Univ. of Ark., 315 F.3d 1005, 1012 (8th Cir. 2003) (en banc), we affirm in part, reverse in part, and remand.

## I.    BACKGROUND
### A.    Facts[1]

Roberts suffers from a diagnosed mental disability, paranoid schizophrenia. On January 11, 2010, Roberts lived in Omaha, Nebraska, with his parents and siblings. At approximately 5:13 a.m., Roberts's mother, Wanda Roberts (Mrs. Roberts), called 911 and reported that "Roberts was having a psychotic episode and had" attacked a member of the family with a knife or screwdriver and then retreated to the basement. The 911 dispatcher alerted Officers Martinec and Ricker that Roberts was

---

[1]For this interlocutory appeal of the district court's denial of qualified immunity, except as otherwise noted, we accept the district court's findings of fact, taken in the light most favorable to Roberts. See Livers v. Schenck, 700 F.3d 340, 350 (8th Cir. 2012) ("In reviewing a district court's denial of summary judgment based upon qualified immunity, we 'accept[] as true the facts that the district court specifically found were adequately supported, along with those facts that the district court likely assumed.'" (quoting Brown v. Fortner, 518 F.3d 552, 558 (8th Cir. 2008))).

schizophrenic, had attempted to assault a sibling, and potentially had a knife or screwdriver with him in the basement. Roberts admits his mother made this call, but denies the alleged attack occurred.

The officers and Roberts differ as to what happened next. In their depositions the officers testified to the following series of events: Officers Martinec and Ricker responded to the call and spoke to Roberts's parents at their residence. Roberts's parents told the officers they did not believe Roberts was armed, but in Roberts's complaint he said his parents "reported to the officers . . . that [Roberts] might have a knife or screwdriver, but . . . no guns." Shortly thereafter, Officers Raders and Jones joined Officers Martinec and Ricker at the residence. The officers claimed they spoke with Roberts's parents for "a few minutes" and then Mrs. Roberts and Officer Martinec spoke from the top of the basement stairs with Roberts, who was still in the basement. Officer Martinec maintains he spoke with Roberts for "several minutes."

When Roberts refused Officer Martinec's request to come upstairs, the officers went into the basement. Officer Martinec drew his firearm, and the other officers carried drawn tasers. When the officers entered the basement, Roberts was lying on his bed in a curtained-off section of the basement. As the officers approached the bed, Officer Martinec told Roberts to get his hands up. Officer Martinec twice told Roberts to lie down on the floor and put his arms to the side. Roberts sat up with his knees on the bed and put his hands up. Roberts did not lie down. Roberts was calm and coherent. Officer Martinec admits he and Officer Ricker were within two to four feet of Roberts when Officer Martinec gave this order, and that Roberts would have had to lie down "[o]n the open spot in between [Officer Martinec] and Officer Ricker" and would be "[w]ithin a foot" of each officer. Officer Jones did not understand whether Officer Martinec intended for Roberts to lie down on the floor or on the bed.

Officer Ricker proceeded to secure Roberts, moving to the foot of Roberts's bed and grabbing Roberts by the left arm. Officer Martinec moved to holster his weapon,

preparing to help Officer Ricker secure Roberts. Pulling away from Officer Ricker, Roberts reached under a pillow and drew a silver kitchen knife, which he swung at Officer Ricker. Officer Martinec pulled his weapon and fired six rounds, hitting Roberts in multiple places.

Roberts has minimal memory of the shooting, but he contests the officers' version of events. And some of Roberts's objections to the officers' narrative are not wholly devoid of evidentiary support. Roberts highlights that a mere six minutes elapsed between the time Officers Martinec and Ricker notified dispatch they had arrived at Roberts's house and the time they called for an ambulance after the shooting. Roberts notes Mrs. Roberts and Roberts's brother Zachary stated in affidavits they did not hear the officers speak to Roberts when the officers were in the basement. Mrs. Roberts and Zachary claimed they heard gunshots within "[t]en to twenty seconds" after the officers entered the basement. Roberts stresses that Mrs. Roberts and Zachary stated "[t]he gunshots were fired in two separate groups of two or three." The district court accepted Roberts's factual position for the purposes of summary judgment, finding some evidence suggested "Officer Martinec continued to fire shots at [Roberts] after he was subdued and no longer posed a threat," and circumstantial evidence indicated "use of deadly force against [Roberts] may have been unreasonable."

Roberts also contends Officer Ricker seized Roberts and threw him to the floor before Officer Martinec shot Roberts. In support of this contention, Roberts claims photographs of the crime scene display no bullet holes and little blood on Roberts's sheets. Roberts asserts his covers were out of place in the photographs, and there was blood on the floor. The district court did not find as a matter of fact whether Officer Ricker attempted to throw or did throw Roberts to the floor, and Roberts produced no expert or other testimony to substantiate his theories regarding the photographic evidence.

-4-

Roberts "vehemently disputes" the evidence that he threatened the officers with a knife. In support of his position, Roberts points to a photograph of a knife on the floor of his basement bedroom, suggesting the knife is "in the opposite direction one would expect if it were being violently swung at an officer located at the foot of the bed." Roberts contends "the officers used knives found in [his] cluttered room to justify an unprovoked shooting." The district court stated it could not "discern the level of threat posed by the knife described or how it was brandished, if at all."

Roberts argues he produced evidence indicating Officer Martinec shot Roberts in the back. The district court acknowledged "[b]oth parties have submitted hospital photographs of [Roberts] in support of and opposition to that contention. Without some explanatory evidence or testimony, the court is not able to discern exactly what the photographs portray." The district court did not rely on this allegation when discussing Roberts's claim of excessive force, which indicates the district court did not find the photographs sufficient, without some explanatory testimony, to show Roberts was shot in the back.

### B.    Procedural History

Roberts sued the city and the officers on April 7, 2011, alleging violations of the ADA, the Rehabilitation Act, the Fourth and Fourteenth Amendments, and state law. On March 15, 2012, the defendants moved for summary judgment, arguing Roberts had not produced sufficient evidence to create a genuine dispute of material fact as to any of his claims. See Fed. R. Civ. P. 56(a). The defendants' motion did not expressly raise the issue of qualified immunity. Roberts responded to the Motion for Summary Judgment on May 4, 2012. On July 7, 2012, the defendants moved to amend their summary judgment motion to include the defense of qualified immunity.

The district court granted the defendants' motion to amend, and denied the motion for summary judgment in part and granted the motion in part. Specifically, the district court granted the defendants' motion for summary judgment on Roberts's

claim "that the officers [sic] attempts to secure [Roberts in handcuffs] or take him into custody were improper," reasoning "there [was] no evidence from which a reasonable jury could conclude that [Roberts] was secure and was not a threat to officers or anyone else in the home when they found him in the basement." Without considering separate conduct of each individual officer, and without analyzing what specific alleged conduct violated the plaintiff's clearly established constitutional or statutory rights, the district court denied the motion for summary judgment as to all other claims.

The defendants appeal.

## II. DISCUSSION

### A. Standard of Review

The officers are entitled to qualified immunity unless Roberts produced sufficient evidence, considered in the light most favorable to Roberts, to show the officers violated Roberts's clearly established federal constitutional or statutory rights. See Livers, 700 F.3d at 350. A constitutional or statutory right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). To overcome qualified immunity, Roberts must prove "that in the light of pre-existing law the unlawfulness [of each of the officer's conduct was] apparent." Id.

"Qualified immunity is '*immunity from suit* rather than a mere defense to liability.'" Robbins v. Becker, 715 F.3d 691, 693 (8th Cir. 2013) (emphasis in original) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)). We may therefore hear an appeal from the district court's denial of summary judgment based on qualified immunity; "otherwise, it would be effectively unreviewable." Id. (quoting Jones v. McNeese, 675 F.3d 1158, 1160 (8th Cir. 2012) (quoting Scott v. Harris, 550 U.S. 372, 376 n.2 (2007))) (internal quotation marks omitted). Our interlocutory

review is narrow and limited.  See id.  "We may review a district court's order denying qualified immunity to the extent that it turns on an issue of law," but "[w]e have no jurisdiction to determine whether or not the pretrial record sets forth a genuine issue of fact for trial."  Id. (quoting McNeese, 675 F.3d at 1160-61) (internal quotation marks omitted).

On review of a district court's denial of qualified immunity at summary judgment, we

> accept as true the facts that the district court specifically found were adequately supported, along with those facts that the district court likely assumed.  Where there are questions of fact the district court did not resolve, we determine the facts that it likely assumed by viewing the record favorably to the plaintiff as in any other summary judgment motion.

Livers, 700 F.3d at 350 (quoting Brown, 518 F.3d at 557-58) (alteration omitted).

## B.    Rehabilitation Act and ADA Claims

The district court denied the defendants' motion for summary judgment on the Rehabilitation Act and ADA claims, reasoning "[t]here is evidence from which a jury could infer that the officers' initial seizure of [Roberts] was due to his disability and not for any criminal activity."  The district court did not identify this evidence, nor did it explain how the evidence was sufficient to prove the officers violated Roberts's clearly established rights under the ADA and Rehabilitation Act.

The qualified immunity defense is available for ADA and Rehabilitation Act claims.  See Gorman v. Bartch, 152 F.3d 907, 914 (8th Cir. 1998); Lue v. Moore, 43 F.3d 1203, 1205 (8th Cir. 1994).  Therefore, the officers were entitled to summary judgment unless Roberts produced evidence showing the officers violated a clearly

established right under these statutes. See Livers, 700 F.3d at 350; Gorman, 152 F.3d at 914.

Roberts asserts the officers interfered with his statutory right to be taken into custody and transported to the hospital without discrimination. Specifically, Roberts maintains the ADA and Rehabilitation Act gave Roberts the right (1) to be taken into custody safely and in a manner consistent with his special needs, and (2) not to be arrested or otherwise discriminated against on the basis of his disability. There is no clearly established law indicating Roberts's suggested rights applied in the circumstances of this case. The district court should have granted the officers qualified immunity on these claims.

Roberts claims the ADA and Rehabilitation Act required the officers to take Roberts's disability into account when attempting to secure Roberts and take him into custody, citing Gorman, 152 F.3d at 911-16. In Gorman, officers arrested Gorman, a paraplegic confined to a wheelchair, after Gorman argued with a bar employee and then two police officers. See id. at 909. Over Gorman's protests, the officers placed Gorman in a police van that was not wheelchair accessible and did not follow all of Gorman's directions regarding the special care Gorman would need to accommodate his disability. See id. at 909-10. Gorman fell from his seat during transport, suffering severe injuries and indignities. See id. at 910. We held "Gorman's allegations that the [officers] denied him the benefit of post-arrest transportation appropriate in light of his disability fall within the framework of both . . . the ADA and . . . the Rehabilitation Act." Id. at 913. Roberts is correct in noting the ADA and the Rehabilitation Act apply to law enforcement officers taking disabled suspects into custody. Gorman does not explain what duties, if any, the ADA and Rehabilitation Act impose on officers who are attempting to secure a potentially violent suspect in an uncertain and rapidly evolving situation. See Rosen v. Montgomery Cnty. Md., 121 F.3d 154, 158 (4th Cir. 2007) ("The police do not have to get an [ADA-qualified hearing impairment] interpreter before they can stop and shackle a fleeing bank

robber"); Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000) (holding the ADA "does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life"). Gorman alone did not put the officers on notice that their conduct in attempting to secure Roberts may violate the ADA and Rehabilitation Act.

Roberts also pursues what is sometimes called the "wrongful arrest" theory of ADA and Rehabilitation Act liability. See Gohier v. Enright, 186 F.3d 1216, 1220-22 (10th Cir. 1999). Under this theory, law enforcement officers may be liable under the ADA and Rehabilitation Act if the officers unreasonably mistake an innocent, disability-related behavior for criminal conduct. See, e.g., Jackson v. Inhabitants of the Town of Sanford, Civ. No. 94-12-P-H, 1994 WL 589617, at *1, 6 (D. Me. Sept. 23, 1994) (finding a municipality could be held liable under the ADA for wrongful arrest after officers mistook the plaintiff's facial paralysis for intoxication). Even assuming Jackson—a district court opinion from another circuit—is consistent with the law in our circuit, Jackson did not clearly establish the officers' duties in the circumstances of this case, where the officers were responding to a report that Roberts was engaged in unlawful violent behavior, attacking a member of his family with a knife or screwdriver. See Gohier, 186 F.3d at 1222 (holding the wrongful arrest theory did not apply because the officer "did not misperceive lawful conduct caused by [the plaintiff's] disability as criminal activity and then arrest him for that conduct. [The plaintiff's] conduct was not lawful.").

Taking all disputed facts in Roberts's favor, nothing in the law clearly established the ADA and Rehabilitation Act applied to the undisputed circumstances of this case. No reasonable officer could have known the ADA and Rehabilitation Act imposed a duty on the officers to accommodate Roberts's disability while the officers were attempting to secure Roberts and take him into custody for his own safety and the safety of the officers and Roberts's family. See Hainze, 207 F.3d at 801. The

officers are entitled to qualified immunity on Roberts's ADA and Rehabilitation Act claims.

## C.    Fourth Amendment

The district court denied, in part, summary judgment on Roberts's Fourth Amendment excessive force claims, finding "factual disputes with respect to whether the officers reasonably believed [Roberts] committed a crime, whether he was a threat to the officers, himself, or others, and whether he was actively resisting arrest."  Also, the district court found "some evidence suggesting that Officer Martinec continued to fire shots at [Roberts] after he was subdued and no longer posed a threat." "Viewing the evidence and drawing all reasonable inferences in the light most favorable to [Roberts]," the district court found genuine disputes of material fact precluding summary judgment.

At the outset we emphasize the district court did not conduct an individualized analysis of each officer's alleged conduct to determine whether the factual allegations against each individual officer were sufficient to overcome qualified immunity.[2]  See Livers, 700 F.3d at 351 (noting the district court "did not specify which acts of which defendant required denying qualified immunity"); Baribeau v. City of Minneapolis, 596 F.3d 465, 482 (8th Cir. 2010) (explaining under "qualified immunity, a county employee may be held personally liable for a constitutional violation only if his own conduct violated a clearly established constitutional right").  On appeal we apply the

---

[2]Under our supervisory authority over the lower courts, we recently reiterated and explained, "Due to the significance of an early resolution for qualified immunity issues—with an effective interlocutory appellate review—we consequently require findings of fact and conclusions of law, similar by analogy to Fed. R. Civ. P. 52(a)(2) (addressing 'an interlocutory injunction'), sufficient to permit our court (1) to determine what facts the district court assumed, in the light most favorable to the nonmoving party, and (2) to evaluate the district court's individualized legal analysis." Robbins, 715 F.3d at 694 & n.2.

qualified immunity analysis to each of the individual officers, accepting as true the specific facts the district court assumed to be true for summary judgment purposes, as well as those "'facts the district court, in the light most favorable to the nonmoving party, likely assumed.'" See Livers, 700 F.3d at 351 (quoting Johnson v. Jones, 515 U.S. 304, 319 (1995)).

Applying this standard, Officer Martinec is not entitled to qualified immunity. The Fourth Amendment prohibits officers from using deadly force to make an arrest "unless that individual poses a threat of serious physical harm." Nance v. Sammis, 586 F.3d 604, 611 (8th Cir. 2009). "[W]here the suspect 'poses no immediate threat to the officer and no threat to others,'" deadly force is not justified. Id. at 610 (quoting Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005)).

The district court found a genuine dispute of material fact regarding whether Roberts posed an objectively reasonable threat of violence during the entire encounter. Some evidence intimates Officer Martinec fired his weapon at Roberts several times, paused, and fired several more times, possibly shooting Roberts in the back. We are bound by the district court's evidence-supported factual findings for purposes of Officer Martinec's appeal. See Livers, 700 F.3d at 350.[3]

Officers Jones and Raders are entitled to qualified immunity insofar as their own conduct is concerned. Roberts admits Officer Martinec was the only officer to fire on Roberts. Roberts does not allege Officers Jones or Raders made physical contact with or otherwise applied any force against Roberts. Simply put, Officers Jones and Raders did nothing that could arguably support a claim of excessive force.

---

[3]We do not address whether Roberts, who has little memory of the shooting and no witness or expert testimony to support his position, presented sufficient evidence on summary judgment to rebut the officers' unanimous assertions that Roberts pulled a knife on the officers.

As for Officer Ricker, Roberts alleges Officer Ricker used excessive force in attempting to throw Roberts to the floor before the shooting. Even assuming Roberts produced sufficient evidence to show Officer Ricker attempted to throw Roberts to the floor, given the uncontested circumstances of this case, a reasonable officer in Officer Ricker's position would not have understood this conduct was unlawful. Officer Ricker was justified in using reasonable force to arrest and secure Roberts in light of Mrs. Roberts's report that Roberts had attacked a family member with a weapon and potentially was still armed. See Chambers v. Pennycook, 641 F.3d 898, 905 (8th Cir. 2011) (advising that "'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it'" (quoting Graham v. Connor, 490 U.S. 386, 396 (1989))). Officer Ricker reasonably might have believed, as would the hypothetical reasonable law enforcement officer, that it was necessary to bring Roberts forcefully to the floor for Roberts's own safety and the safety of the officers. See Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009) ("[T]he test is whether the amount of force used was objectively reasonable under the particular circumstances."). In the uncertain and rapidly evolving circumstances in which Officer Ricker found himself, we cannot say it was objectively unreasonable for Officer Ricker to move Roberts off the bed and to the floor after Roberts refused to comply with Officer Martinec's order to lie down. See id. (emphasizing "[w]e evaluate the reasonableness of an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight'" (quoting Graham, 490 U.S. at 396)).

Roberts proposes Officers Jones, Raders, and Ricker can be liable for failing to prevent Officer Martinec from using excessive force against Roberts. The district court found Roberts abandoned this theory of liability because it was not listed in the district court's pretrial order. Roberts did not contest this finding on appeal, so Roberts waived this claim and cannot now recover under the failure to act theory. See Jenkins v. Winter, 540 F.3d 742, 751 (8th Cir. 2008) (noting "[c]laims not raised in an opening brief are deemed waived").

## D. Municipal Liability

The district court also denied summary judgment to the city, reasoning "[t]here are . . . issues of fact with respect to the adequacy of the City's training." We ordinarily only have "'jurisdiction on interlocutory appeal . . . [to resolve] the issue of qualified immunity.'" Lockridge, 315 F.3d at 1012 (quoting Mettler v. Whitledge, 165 F.3d 1197, 1202 (8th Cir. 1999)). However, we have pendent appellate jurisdiction over certain claims that are "inextricably intertwined" with the qualified immunity analysis. Id. "An issue is inextricably intertwined with properly presented issues only when the appellate resolution of the collateral appeal necessarily resolves the pendent claims as well." Id. (quoting Kincade v. City of Blue Springs, Mo., 64 F.3d 389, 394 (8th Cir. 1995)) (internal quotation marks omitted).

Roberts alleged the city deprived him of the benefits of a public service—safe and lawful police detention—because the city failed properly to train its employees under the ADA and Rehabilitation Act. As is the case for failure to train claims arising under § 1983, actions under the ADA and the Rehabilitation Act require proof of deliberate indifference. See Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir. 2011) (adopting deliberate indifference standard for actions to recover compensatory damages under the ADA and Rehabilitation Act); Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 389-90 (8th Cir. 2007) (en banc) (deciding, to establish liability against a municipality based on an official policy, the plaintiff must show the municipality was deliberately indifferent to a known risk that the policy at issue would result in violations of constitutional rights). In Szabla, we held, where the constitutional right allegedly violated by individual officers was not clearly established at the time of the occurrence, the municipality could not be liable for failure to train because the risk of harm "was not so obvious at the time of th[e] incident that [the municipality's] actions [could] properly be characterized as deliberate indifference." Szabla, 486 F.3d at 393.

Roberts can only prevail on his ADA and Rehabilitation Act claims by showing the city's deliberate indifference to his alleged right to be free from discrimination in the circumstances of this case, but the city, like the individual officers, lacked notice the officers' actions might have violated Roberts's asserted rights. See id. Our decision granting qualified immunity to the individual officers necessarily forecloses liability against the municipality on Roberts's failure to train claims as well. See Cooper v. Martin, 634 F.3d 477, 481-82 (8th Cir. 2011). The issue of the city's liability therefore is "inextricably intertwined" with the qualified immunity issues in this appeal. Lockridge, 315 F.3d at 1012. Having jurisdiction over this pendent appellate claim, we reverse the district court's denial of the city's motion for summary judgment on Roberts's ADA and Rehabilitation Act failure to train claims against the city.

## III.    CONCLUSION

We affirm in part and reverse in part. We affirm the district court's denial of qualified immunity and denial of summary judgment to Officer Martinec on Roberts's Fourth Amendment excessive force claim in securing Roberts. We reverse the denial of qualified immunity and denial of summary judgment for Officers Ricker, Jones, and Raders on Roberts's Fourth Amendment excessive force claims as to these individual officers. We reverse the district court's denial of qualified immunity for all the officers and the denial of summary judgment as to the ADA and Rehabilitation Act claims. We also reverse the district court's denial of the city's motion for summary judgment on Roberts's ADA and Rehabilitation Act failure to train claims. We remand for further proceedings consistent with this opinion.

_____