Filed 08/05/24

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| CATHY AUSTRIAN, on behalf of her minor child, J.A.,<br>  Plaintiff<br><br>v.<br><br>CITY OF BURLINGTON,<br>  Defendant | Docket No. 24-CV-370 |

## RULING ON DEFENDANT'S MOTION TO DISMISS

Plaintiff Cathy Austrian brings this civil rights action against the City of Burlington arising from a police encounter involving her minor child J.A. in May 2021. She claims that the police used excessive force in violation of Article 11 of the Vermont Constitution, and that their treatment of J.A. amounted to several violations of the Vermont Fair Housing and Public Accommodations Act. 9 V.S.A. § 4500 *et seq.* The City moves to dismiss pursuant to Rule 12(b)(6).

### Alleged Facts

The following facts are alleged in the complaint. The court makes no finding as to their accuracy.

J.A. is a black minor child with a documented history of behavioral and intellectual disabilities. He was 14 years old at the time of the incident underlying this complaint.

On May 15, 2021, J.A.'s mother, Cathy Austrian, called the Burlington Police Department and welcomed two officers into her home following J.A.'s retail theft of vape pens from a local Cumberland Farms convenience store. She told the officers that J.A. was recently placed on an increased dose of medication for ADHD and had recently been

acting strangely. She also told them that J.A. was behaving "in a manner somewhat disconnected from reality" and had a recent MRI of his heart. She led the officers upstairs, where she expected them to speak with J.A.

Right away, the officers were or should have been aware that J.A. had some kind of mental, intellectual, or emotional disability based on his mother's instruction, the Department's familiarity with J.A., and the officers' observations of J.A., who sat on his bed, largely non-communicative, for the first 10 minutes of the encounter. After recovering all of the stolen items except one, the officers threatened J.A. with handcuffing and arrest if he did not produce the final item, which he held in his hand while remaining quietly seated.

Shortly thereafter, the officers approached J.A., grabbed him from the bed, wrenched his arms behind his back, and wrested the item from his hands. As a result of his disability, J.A. exhibited a "fear response," seeking to protect himself from the officers and keep them away from his body. The officers then pinned J.A. back to the bed, handcuffed him, and took him to the floor. Once restrained, J.A. panicked, screaming and contorting himself in distress. J.A.'s mother then asked that emergency services be contacted.

A police sergeant asked Burlington Fire Department paramedics to place an opaque mesh bag, or "spit hood," over J.A.'s head, and J.A. began to scream even louder. Paramedics labelled J.A. as experiencing "excited delirium," which Plaintiff alleges is "a racialized and unsubstantiated condition rejected by the medical community and often attributed to the victims of police violence who are Black." Compl. ¶¶ 18, 92. After receiving permission from an off-site doctor, and despite knowing of J.A.'s heart problems and disabilities, paramedics then injected J.A. with ketamine, a highly potent fast-acting

2

anesthetic used to induce loss of consciousness. The injection rendered J.A. unconscious, and the paramedics removed him in a stretcher bad and brought him to the hospital, where he remained on a heartrate monitor for the night.

As a result of this encounter, J.A. experienced physical bruising, unconsciousness, extreme fear, discrimination, loss of dignity, and an exacerbation of his behavioral disabilities at home and school. Plaintiff alleges that the City employees' actions were contrary to departmental directives and policy. Specifically, she alleges that they could have given J.A. more time and space, engaged him verbally to try to obtain the single remaining item, called a supervisor to seek guidance, requested a clinician for support, and otherwise avoided escalation. Additionally, she alleges that after successfully recovering the last stolen item, they could have simply disengaged and left J.A. in his home with his mother rather than again physically escalating the situation.

Discussion

In Count 1, Plaintiff claims that the Burlington Police Department used unjustified and unreasonable force against J.A., in violation of Article 11 of the Vermont Constitution. Compl. ¶¶ 173–88. Counts 2 through 5 all allege violations of the Vermont Fair Housing and Public Accommodations Act (VFHPAA), 9 V.S.A. § 4500 *et seq*. In Count 2, Plaintiff alleges that the City failed to make modifications for J.A.'s disability as to both the police officers' interaction with him and the paramedics' interaction with him. Compl. ¶¶ 189–206. Count 3 claims that the City denied J.A. equal services based on race, through the officers' perception of J.A. as a disproportionately aggressive physical threat and the paramedics' pathology of J.A.'s distress as "excited delirium." Compl. ¶¶ 207–26. The last two counts allege a failure to adequately train both City police officers (Count 4) and City paramedics (Count 5) on their obligations under the VHFPAA. Compl. ¶¶ 227–36, 237–

3

51. Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, costs, and attorneys' fees.

The City moves to dismiss pursuant to V.R.C.P. 12(b)(6). The City contends that: (1) its officers conducted a reasonable search and seizure as permitted by Article 11; (2) its police and fire departments are not subject to VFHPAA; (3) even if VFHPAA applies, it made reasonable efforts to account for J.A.'s purported disabilities; and (4) its police and fire departments are protected by qualified immunity. Preliminarily, however, the court addresses the bodycam video footage that the City submitted along with its motion to dismiss.

## I.     Bodycam Video Footage

The City proffers the police bodycam video from the day in question, arguing that it paints a very different picture from that described in the complaint: patient and gentle attempts by the police and paramedics to calm J.A., rather than the aggressive actions alleged. Plaintiff responds that such evidence is improper on a 12(b)(6) motion to dismiss.

It is well settled that "[w]hen the complaint relies upon a document . . . such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss. Similarly, . . . courts may properly consider matters subject to judicial notice, such as statutes and regulations, and matters of public record." Kaplan v. Morgan Stanley & Co., 2009 VT 78, ¶ 10 n.4, 186 Vt. 605 (citations and quotation omitted). The City first argues that the court may consider the video because Plaintiff referenced it in the complaint. However, Plaintiff referenced the video only in passing, as something reviewed by the Police Commission. *See* Compl. ¶ 170 ("After reviewing the complaint, the body camera footage, and the confidential results of BPD's internal investigation, the Burlington Police Commission made several recommendations to

4

Police Chief Jon Murad."). That is not sufficient to merge the video into the complaint. "A mere passing reference or even references[] to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself." Williams v. Time Warner Inc., 440 F. App'x 7, 9 (2d Cir. 2011); *see also*, *e.g.*, Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint.").

The City next argues that the footage is "central to Plaintiff's claims" because "it depicts the relevant events of May 15, 2021." Reply at 3. "[C]ourts resolving Rule 12(b)(6) motions may consider matters incorporated by reference *or integral to the claim*." Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (4th ed.) (emphasis added). But there is no indication that Plaintiff relied on the video in drafting the complaint. Because both J.A. and his mother witnessed the entirety of the relevant events, the complaint could have been based on their witness testimony alone. *See* Smith v. City of Greensboro, No. 1:19CV386, 2020 WL 1452114, at *3 (M.D.N.C. Mar. 25, 2020) ("The factual allegations . . . stand independent of the video, and may conceivably be proven without it . . . via witness testimony[]. Nor is there any indication from Plaintiffs that they actively relied upon the video in crafting the complaint. Thus, the video is not 'integral' to the complaint.") (citation omitted); Sidi v. City of Cincinnati, No. 1:13CV242, 2014 WL 1276195, at *1 n.3 (S.D. Ohio Mar. 27, 2014) ("While there just so happens to be a video recording of the events at issue in this case, the ability of Plaintiffs to bring their claims did not rest on the existence of the video recording."); *cf.* Bell v. City of Southfield, Michigan, 37 F.4th 362, 364 (6th Cir. 2022) ("[T]he videos here are already in the record.

5

Indeed, the plaintiff's complaint implicitly relies on the videos by recounting facts that could only be known to him by watching the videos.").

The City alternatively contends that the bodycam footage is a "matter[] of public record" because: (1) it meets the definition of "public record" under Vermont's Public Records Act; (2) it was reviewed by the City's police commission in their review of the incident; and (3) selected parts of the footage were distributed by Plaintiff's attorneys to the media. The City construes the term "public record" in this context much too broadly. Courts have limited the "public record" exception. *See* Alharbi v. Beck, 62 F. Supp. 3d 202, 208–09 (D. Mass. 2014) ("As for the 'official public records' exception to the motion to dismiss standard of review, the First Circuit has held that it 'appears limited, or nearly so, to documents or facts subject to judicial notice under Federal Rule of Evidence 201,' which refers to facts 'not subject to reasonable dispute' because they are 'generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir.2013); Fed.R.Evid. 201); In re Rockefeller Ctr. Properties, Inc. Sec. Litig., 184 F.3d 280, 292–93 (3d Cir. 1999) (Nygaard, J., concurring and dissenting) ("[M]atters of public record do not include all documents which may be accessible to the public. Rather, it has been limited to the following documents: criminal case dispositions such as convictions or mistrials, letter decision of government agencies and published reports of administrative bodies. Specifically, we have excluded from our definition of public record, for purposes of a motion to dismiss, material that might be subject to disclosure under the [Freedom of Information Act].") (citation and quotation omitted) (brackets in original). And with good reason: "Many documents in the possession of public agencies simply lack any indicia of reliability

6

whatsoever. In that regard, they are unlike official records, such as birth or death certificates and other similar records of vital statistics." Freeman, 714 F.3d at 36.

Moreover, the majority of courts to have addressed this precise issue have rejected attempts to use police bodycam footage on motions to dismiss. Those courts generally express concern with taking judicial notice of the contents of a video "in order to rebut Plaintiffs' allegations that the Officers used excessive force and demonstrate that their behavior was reasonable." Ambler v. Williamson Cnty., Texas, No. 1-20-CV-1068-LY, 2021 WL 769667, at *5 (W.D. Tex. Feb. 25, 2021) (concluding that this "clearly exceeds the purview of judicial notice" and that weighing of video was "more appropriately [] reserved for summary judgment or trial"); *see also* Knickerbocker v. United States Dep't of Interior, No. 116-CV-01811-DAD, 2018 WL 836307, at *6 (E.D. Cal. Feb. 13, 2018) (declining to take judicial notice of police video at motion to dismiss stage where government "requests the court take judicial notice of the contents of the video to purportedly show that the defendant rangers did not employ excessive force"); Smith v. City of Greensboro, No. 1:19CV386, 2020 WL 1452114, at *4 (M.D.N.C. Mar. 25, 2020) (same); Solomon v. City of Naperville, No. 22 C 4596, 2023 WL 1992195, at *3 (N.D. Ill. Feb. 14, 2023) ("store security footage undoubtedly is not" a "matter[] of public record"); Sidi, 2014 WL 1276195, at *1 n.3 (declining to consider "mobile video recording of the incident attached by the City Defendants to their motion to dismiss" because it was not the "type of public record that the Court should consider without converting the motion to . . . summary judgment"); *but see* McGee v. City of Cincinnati Police Dep't, No. 1:06-CV-726, 2007 WL 1169374, at *1 n.2 (S.D. Ohio Apr. 18, 2007) (considering police videotape on motion to dismiss); Hyung Seok Koh v. Graf, No. 11-CV-02605, 2013 WL 5348326, at *9 (N.D. Ill. Sept. 24, 2013) (same). As the court noted in Sidi, "[t]he

substance and the interpretation of the information contained in the video recording are subject to reasonable dispute, and additional witness testimony may be necessary to fully explain the events that occurred. . ." 2014 WL 1276195, at *1.[1] "No matter how comprehensive, the body-cam footage may still leave open questions of tone, perspective, and context—factual issues to be resolved at a later date." Smith v. City of Greensboro, No. 1:19CV386, 2020 WL 1452114, at *4 (M.D.N.C. Mar. 25, 2020). The court declines to consider the video at this early stage of the case.

## II.    Reasonableness of Search and Seizure under Article 11

The City contends that its officers' search and seizure of J.A. was reasonable as permitted by Article 11 of Vermont's Constitution. "Like the Fourth Amendment, Article 11 'protect[s] citizens against unreasonable searches and seizures.'" Zullo v. State, 2019 VT 1, ¶ 58, 209 Vt. 298 (quoting State v. Manning, 2015 VT 124, ¶ 11, 200 Vt. 423); *see* State v. Berard, 154 Vt. 306, 309 (1990) (noting that Article 11 imports Fourth Amendment's "reasonableness" standard).  Where a plaintiff claims that "the police have used excessive force in effecting an arrest, 'the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Coll v. Johnson, 161 Vt. 163, 164–65 (1993) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). The U.S. Supreme Court's decision in Graham "sets forth a Fourth Amendment constitutional 'floor' under which '*all* claims that law enforcement officers have used excessive force . . . in the course

---

[1] The City cites three cases to support its assertion that such video evidence is "frequently considered by courts on motions to dismiss." Reply at 2. Apparently, counsel failed to read the cases, as two of them ruled on the issue in the context of summary judgment. *See* Scott v. Harris, 550 U.S. 372, 378 (2007) ("this case was decided on summary judgment"); Tindell v. Beard, 351 F. App'x 591, 595–96 (3d Cir. 2009) (considering video while analyzing "the District Court's order granting summary judgment" on excessive force claim). The third was a case in which the plaintiff had "relie[d] on" the videos.). Sledge v. Martin, No. 1:21-CV-00348-RAL, 2023 WL 2332464, at *4 (W.D. Pa. Mar. 2, 2023).

of an arrest . . . should be analyzed.'" Id. at 165 (quoting Graham, 490 U.S. at 395) (emphasis in original). "The reasonableness of the use of force should be viewed from the perspective of a reasonable officer at the scene." Id. at 165 (citing Graham, 490 U.S. at 396).

The alleged facts specific to the Article 11 claim, according to the complaint, are as follows. The police officers "needlessly physically engaged with J.A. to recover the final vape pen" even though "J.A. was passively sitting on the bed without access to any weapon and there were a variety of other options and resources readily available to the officers to accommodate J.A.'s disability and avoid physical confrontation." Compl. ¶ 177. In doing so, they "needlessly accelerated and escalated the situation, failing to consider that their particular . . . tactic [was] more dangerous or unreasonable in light of [J.A.'s] disability." Id. ¶ 178 (quotation omitted) (brackets in original). The officers "physical[ly] struggle[d] with J.A.[,] . . . pinning him face-down onto the bed and removing the pen from his hand by force." Id. ¶ 179. They then "physically restrained [him] again after retrieving the final vape pen and momentarily releasing him. Instead of modifying their response in light of J.A.'s evident disability and distress, the officers re-engaged [him], grabbing his arms, forcing him to the bed and later to the ground, and handcuffing him." Id. ¶ 180. Plaintiff alleges that under the "totality of these circumstances at each stage of the encounter, no reasonable person could conclude that the unarmed J.A. posed a threat to the officers or to himself or that he committed a crime serious enough to justify the officers' use of force in lieu of alternatives." Id. ¶ 186. Thus, Plaintiff concludes, "the officers' decision to forgo de-escalation techniques and physically engage J.A. violated his rights to be free from unreasonable seizure under Article 11." Id.; see also id. ¶¶ 62–88 (providing more detailed account of J.A.'s interactions with police).

The reasonableness test on an excessive force claim "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. 386, 396 (1989); *see also* Simonelli v. Mt. Snow, Ltd, No. 080111, 2013 WL 9348806, at *2 (Vt. Super. Ct. Mar. 07, 2013) (Carroll, J.) (quoting Graham). Additionally, a suspect's mental health condition plays a role in this analysis. *See, e.g.*, Simonelli, 2013 WL 9348806, at *3 ("It is also unclear how apparent Plaintiff's mental illness would have been to Defendant, which would affect the appropriateness of his response."); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir. 2004) ("The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted."); Gray v. Cummings, 917 F.3d 1, 11–12 (1st Cir. 2019) (same); Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 900 (4th Cir. 2016) (same); Phillips v. Cmty. Ins. Corp., 678 F.3d 513, 526 (7th Cir. 2012); (same) Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir. 2010) (same); Giannetti v. City of Stillwater, 216 F. App'x 756, 764–65 (10th Cir. 2007) (same).

Plainly, stealing vape pens from a convenience store cannot be considered a severe crime. And the alleged facts, when viewed in the light most favorable to Plaintiff, indicate that J.A. did not pose an "immediate threat" to anyone's safety. Indeed, the allegations are that when the officers arrived, J.A. was "passively sitting on the bed without access to any weapon" and did not engage with the officers. Thus, the first two Graham factors weigh in Plaintiff's favor. While J.A. did not try to run away, he did actively resist the officers' attempts to recover the last remaining stolen vape pen; that factor weighs in the City's favor.

Additionally, the following alleged facts indicate that the officers were aware that J.A. had some sort of diminished capacity or mental health condition. Upon the officers' arrival, J.A.'s mother told them that he had been "acting really erratically," that his recent behavior seemed "distant," "irritable," and "not really based in reality," that he had a heart MRI three days before, and that his ADHD medication had recently been increased. Compl. ¶¶ 55–57. When the officers saw J.A., they "immediately recognized that [he] was not functioning in a typical manner"; he "was sitting quietly on his bed, staring off into the distance, [and] barely acknowledge[ed] [their] presence." Compl. ¶ 62. The officers also observed J.A.'s mother explain basic points about commercial transactions to him— that when the store clerk handed him the vape pens, the clerk had presumed that J.A. would pay for them before leaving. Id. ¶ 63. A short time later, after the officers had pinned J.A. to the floor, his mother told them that J.A. had "developmental delays," "can't stand to be restrained," and that the handcuffs were making things worse. Id. ¶ 84.

The totality of these alleged facts, when read in the light most favorable to Plaintiff, adequately state a claim for excessive force under Article 11. Although J.A. resisted giving back one stolen vape pen, the crime was not serious, he did not pose an immediate threat, and he did not try to "evade arrest by flight." Graham, 490 U.S. at 396. Additionally, based on the facts pled in the complaint, the officers should have taken into account J.A.'s alleged mental health condition. That might have involved waiting more than 10 minutes before using any kind of physical force. *See* Compl. ¶ 66.

The City contends that the officers' physical restraint of J.A. occurred only in response to J.A.'s "violent action" of physically striking them, and that this decision was made "within seconds" to protect both themselves and him. Mot. to Dismiss at 9; *see also* id. at 4. If those facts are eventually established by evidence, that may well justify the level

11

of force used. But the complaint does not support the City's version of events. Instead, the complaint alleges that "[t]errified and dysregulated . . . , [J.A.] reflexively rose from the bed and flailed his arms haphazardly at the officers," that this "reflexive response is typical of individuals with his disability and trauma history who are placed in unnecessary physical restraints and denied space to re-establish a sense of grounding and safety," and that no one could reasonably conclude that "the unarmed J.A.'s reflexive reaction posed a bona fide threat of serious injury" to either his mother or the officers. Compl. ¶¶ 75–77. Moreover, even assuming that J.A. physically struck the officers and that that justified the subsequent use of force, it would not have justified the earlier use of force when they pinned J.A. down to recover the vape pen when he was sitting passively on the bed.

The court cannot say that it is "beyond doubt that there exist no facts or circumstances that would entitle [Plaintiff] to relief" on the excessive force claim. Montague v. Hundred Acre Homestead, LLC, 2019 VT 16, ¶ 10, 209 Vt. 514 (quotation omitted). The parties' competing versions of the facts can be explored on summary judgment. "The purpose of a dismissal motion "is to test the law of the claim, not the facts which support it." Id. (quotation omitted).

### III.  VFHPAA

Turning to the VFHPAA claims, the City argues that neither the police department nor fire department are subject to the Act. Alternatively, the City argues that even if the Act applies, its employees made reasonable efforts to account for J.A.'s disability, and Plaintiff's allegations of racial discrimination are not sufficient.

### A.  Application of the VFHPAA to Police and Fire Departments

Vermont's Fair Housing and Public Accommodations Act provides:

> An owner or operator of a place of public accommodation or an agent or employee of such owner or operator shall not, because of the race, creed, color, national origin, marital status, sex, sexual orientation, or gender identity of any person, refuse, withhold from, or deny to that person any of the accommodations, advantages, facilities, and privileges of the place of public accommodation.

9 V.S.A. § 4502(a). Additionally, the Act prohibits discrimination by, exclusion from participation in, or the denial of the benefits of any place of public accommodation based on disability. Id. § 4502(c). The Act defines "public accommodation" as "an individual, organization, governmental, or other entity that owns, leases, leases to, or operates a place of public accommodation." 9 V.S.A. § 4501(8). (1) "'Place of public accommodation' means any school, restaurant, store, establishment, or other facility at which services, facilities, goods, privileges, advantages, benefits, or accommodations are offered to the general public." Id. § 4501(1). "As a remedial statute, the [VFHPAA] must be liberally construed in order to 'suppress the evil and advance the remedy' intended by the Legislature. Hum. Rts. Comm'n v. Benevolent & Protective Ord. of Elks of U.S., 2003 VT 104, ¶ 13, 176 Vt. 125 (quoting 3 N. Singer, Statutes and Statutory Construction § 60:1, at 183 (6th ed. 2001)). The parts of Vermont's Public Accommodations Act that address persons with disabilities in places of public accommodation must be applied consistently with the federal Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. *See* 9 V.S.A. § 4500(a); Dep't of Corr. v. Hum. Rts. Comm'n, 2006 VT 134, ¶ 9, 181 Vt. 225.

The City contends that the Act does not apply to police and fire departments, at least in the context of their roles as first responders. The City points to the dissent in Department of Corrections v. Human Rights Commission, but the majority opinion there held quite plainly that "the Legislature intended to make all governmental entities subject to the public accommodations law." 2006 VT 134, ¶ 25. The City also cites cases from New

York and Missouri holding that those states' public accommodations laws do not apply to arrests and detentions. Those cases are not persuasive, however. Notably, the New York case cited Justice Burgess's *dissent* from Department of Corrections, *see* Letray v. New York State Div. of Hum. Rts., 121 N.Y.S.3d 481, 483 (N.Y. App. Div. 2020), while the Missouri case specifically distinguished the Department of Corrections case and explained that the Missouri statute differed from Vermont's. *See* State ex rel. Naugles v. Missouri Comm'n on Hum. Rts., B.A., 561 S.W.3d 48, 55 (Mo. Ct. App. 2018).

Moreover, a clear majority of federal circuits that have addressed the question have held that the Americans with Disabilities Act applies to police interrogations and arrests. *See* Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 336–37 (4th Cir. 2012); Roberts v. City of Omaha, 723 F.3d 966, 973 (8th Cir. 2013); Sheehan v. City & Cnty. of San Francisco, 743 F.3d 1211, 1232 (9th Cir. 2014), rev'd in part on other grounds, 575 U.S. 600 (2015); Gohier v. Enright, 186 F.3d 1216, 1220–21 (10th Cir. 1999); Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1084–85 (11th Cir. 2007); Brunette v. City of Burlington, Vermont, No. 2:15-CV-00061, 2018 WL 4146598, at *34 (D. Vt. Aug. 30, 2018) (Reiss, J.) ("This court therefore follows the majority approach and holds that Title II of the ADA applies to [the police encounter] notwithstanding the exigent circumstances that developed in the course of that encounter."); *but see* Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000) (holding that ADA "does not apply to an officer's on-the-street responses to reported disturbances . . . , whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life").

The City maintains that applying the VFHPAA to arrests would "curtail the ability of first responders to handle emergencies efficiently and safely." Mot. to Dismiss at 13.

However, the "'exigent circumstances' of the police encounter 'and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the [Act] applies in the first instance.'" Brunette, 2018 WL 4146598, at *34 (quoting Sheehan, 743 F.3d at 1232); *see also* Williams v. City of New York, 121 F. Supp. 3d 354, 365 (S.D.N.Y. 2015) ("the reasonableness of the accommodation required must be assessed in light of the totality of the circumstances of the particular case").

### B. Reasonable Efforts to Account for Disabilities

The City next argues that its officers and other first responders were not sufficiently aware of J.S.'s disability and, even assuming they were, they in fact made sufficient modifications while interacting with J.A. The City further argues that Plaintiff's suggested modifications were not feasible.

The City asserts that J.A.'s mother described his disabilities in "vague terms." According to the Complaint, the Burlington Police Department was already familiar with J.A.'s "unique needs" from prior interactions. Compl. ¶ 8, 53, 60–61. On the day of the stolen vapes incident, May 15, 2021, the officers first responded to the Cumberland Farms, where witnesses described J.A. as "awkward," "acting weird," and "[not] talking back," and stated that "something was wrong with him." Id. ¶ 54. When the officers arrived at J.A.'s home, J.A.'s mother told them that J.A.'s ADHD medication had recently been increased, that he was "acting really erratically this afternoon," that his recent behavior seemed "distant," "irritable," and "not really based in reality," and that he recently had a heart MRI. Id. ¶¶ 55–57. Additionally, when the officers saw J.A., they "immediately recognized that [he] was not functioning in a typical manner"; he "was sitting quietly on his bed, staring off into the distance, [and] barely acknowledge[ed]

15

[their] presence." Compl. ¶ 62. These allegations, taken together and read in the light most favorable to Plaintiff, could potentially support a conclusion that the officers knew or should have known that J.A. had some sort of disability and might require accommodations. *See* Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008) (holding that "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled"); Sage v. City of Winooski through Police Dep't, No. 2:16-CV-116, 2017 WL 1100882, at *4 (D. Vt. Mar. 22, 2017) (nonspecific warning that man was resident of group home that housed people with mental illness was sufficient to put officers on notice of disability, and allegation that "police could have accommodated him by avoiding physical contact and calling a nearby mental health counselor" was sufficient to identify potential accommodations).

While the City argues that its officers and employees made reasonable and sufficient modifications to accommodate J.A., that argument contradicts the Complaint's allegations: that officers approached a passively seated child, stated "I'm not playing this game anymore," threatened J.A. with handcuffs, escalated the situation into a physical confrontation, and used a "racialized pseudo-diagnosis" of "excited utterance" to justify a ketamine injection. Compl. ¶¶ 66–67, 92, 118, 156, 203, 250; *see also* Opp'n at 29. The Complaint further alleges numerous alternatives as outlined by the police department's own policies: "respecting the individual's comfort zone, elongating the time of the encounter, creating a safe perimeter, avoiding unnecessary contact and agitation, seeking professional resources, employing non-threatening verbal communication, and using open-ended questions." Compl. ¶¶ 198–99; *see also* id. ¶¶ 127–46. The feasibility of these potential alternatives cannot be decided on a motion to dismiss. *See* Butchino v. City of

16

Plattsburg, No. 820CV796MADCFH, 2022 WL 137721, at *11 (N.D.N.Y. Jan. 14, 2022) ("Whether a reasonable accommodation was available and feasible is a question of fact for the jury.").

## C. Racial Discrimination

The City argues, only in passing and with no meaningful analysis, that Plaintiff has failed to allege any racial discrimination to support Count 3. *See* Mot. to Dismiss at 7 (arguing that Plaintiff "baselessly accuses BPD and BFD personnel of acting with bias absent any factual allegations demonstrating race-based . . . discrimination."); id. at 20 ("At no point did any of the . . . first responders indicate any bias toward J.A. because of his race, nor did they take any actions that indicate a difference in approach because of his race.").

To survive a motion to dismiss, Plaintiff need only plead enough facts to support a reasonable inference of discrimination. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86–87 (2d Cir. 2015); Surtain v. Hamlin Terrace Found., 789 F.3d 1239, 1246 (11th Cir. 2015) ("a complaint need only provide enough factual matter (taken as true) to suggest intentional race discrimination.") (quotation omitted); In re Flint Water Cases, 384 F. Supp. 3d 802, 846 (E.D. Mich. 2019) ("At this stage in the case, plaintiffs need only raise an inference of discriminatory purpose."); *cf.* Spinette v. Univ. of Vermont, 2023 VT 12, ¶ 13, 292 A.3d 1225, 1230 (Vt. 2023) ("Plaintiff could establish the necessary discriminatory intent through direct or indirect evidence"). Here, Plaintiff alleges that the police officers "perceived J.A.—an unarmed 14-year-old child—as a disproportionately aggressive physical threat because of his race." Compl. ¶ 214. The specific alleged circumstances that suggest this perception include:

the speed with which the officers moved to physically subdue J.A., treating him as if he posed an imminent danger; and Officer Caldieri's Use of Force Report, which describes J.A. in an exaggerated manner—including that they were forced to place him in a "hammerlock" "for our safety" and stating that J.A. "got to his feet and closed the distance to us" and "began punching and elbowing . . . erratically and with determination"—claims that greatly overstate J.A.'s fear response.

Id. ¶ 215. The officers' "overreaction" was allegedly "primed" by the department's "excited delirium" policy, which "echo[ed] longstanding stereotypes mischaracterizing Black men and boys' distress as dangerous." Id. ¶ 216.

Plaintiff further alleges that the officers "pathologized J.A.'s distress as a medical condition rather than a response to pain and restraint" and thus "harbor[ed] racialized assumptions about the legitimacy of his distress, his capacity for pain, and his ability to self-regulate if given the opportunity to de-escalate," "diagnosed J.A. with 'excited delirium'—a pseudo-scientific condition frequently attributed to young Black men who are the victims of police violence," and injected him with ketamine rather than attempt de-escalation techniques. Id. ¶¶ 217–21. This "race-based disparate treatment," Plaintiff alleges, "would not have occurred had J.A. been white." Id. ¶ 221. Moreover, city employees have "respond[ed] to similarly situated white individuals exhibiting similar behavior with more dignified and humane treatment than that perpetrated on J.A." Id. ¶ 225.

These allegations are more than sufficient to support a claim of racial discrimination on a motion to dismiss. Importantly, Plaintiff also alleges that, through their actions, the City's employees violated departmental policy. The U.S. Supreme Court has recognized that "[d]epartures from [] normal procedur[e]" and "[s]ubstantive departures" from departmental policies may further support discriminatory intent. Vill.

18

of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977). Given the City's failure to develop its argument for dismissal of Plaintiff's race-based claim beyond a couple of mere conclusory sentences, that claim easily survives the motion to dismiss.

## IV. Qualified Immunity

Lastly, the City argues that regardless of its arguments raised above, its police and fire departments are protected from tort liability under the doctrine of qualified immunity. Qualified immunity applies to "the conduct of lower level public officials so long as they are: '(1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts.'" Czechorowski v. State, 2005 VT 40, ¶ 10, 178 Vt. 524 (quoting Murray v. White, 155 Vt. 621, 627 (1991).

Plaintiff contends that qualified immunity shields only individual government employees, and therefore does not apply to the claims against the City. Opp'n at 36. However, Plaintiff states in her complaint that she is suing the City pursuant to 24 V.S.A. § 901a, which provides:

> (b) When the act or omission of a municipal employee acting within the scope of employment is alleged to have caused damage to property, injury to persons, or death, the exclusive right of action shall lie against the municipality that employed the employee at the time of the act or omission; and no such action may be maintained against the municipal employee or the estate of the municipal employee.
> (c) When a municipality assumes the place of a municipal employee in an action as provided in subsection (b) of this section, the municipality may assert all defenses available to the municipal employee, and the municipality shall waive any defense not available to the municipal employee, including municipal sovereign immunity.

24 V.S.A. § 901a(b)–(c); *see also* Civetti v. Turner, 2020 VT 23, ¶ 32, 212 Vt. 185 ("Plaintiff's claims against the Town, via § 901 and § 901a, are subject to the Road

Commissioner's legal defenses. Among those defenses is qualified immunity for certain discretionary acts."); Kew v. Town of Northfield, VT, No. 5:19-CV-78, 2023 WL 4172741, at *34 (D. Vt. Apr. 17, 2023) (Crawford, J.), opinion vacated in part on other grounds on reconsideration, 681 F. Supp. 3d 247 (D. Vt. 2023) ("Under this statutory scheme, [the municipality] steps into the shoes of the defendant officers with all attendant defenses available to the officers, including state qualified immunity."). Plaintiff characterizes her claims as having been "brought directly against the City, rather than the City standing in its employees' shoes." Opp'n at 37. That may be true of the two failure-to-train claims (Counts 4 and 5), but the other claims (1 through 3) plainly arise from the actions of the City's police officers and paramedics.

Plaintiff also asserts that the Vermont Supreme Court has foreclosed the use of qualified immunity on an Article 11 claim in Zullo v. State, 2019 VT 1, ¶ 54, 209 Vt. 298. In fact, the Zullo Court held that "imposing restrictions akin to qualified immunity is appropriate" with respect to constitutional torts. Id. ¶ 54. Plaintiff further argues that qualified immunity does not apply to a VFHPAA claim, because the Act is a remedial statute and because no reported case has apparently applied qualified immunity to such a claim before. Opp'n at 40–41. However, Plaintiff points to no authority explicitly stating that qualified immunity cannot apply to VHFPAA claims. Notably, the Vermont Supreme Court has applied qualified immunity to a different type of discrimination claim. *See* Mellin v. Flood Brook Union Sch. Dist., 173 Vt. 202, 213 (2001) (school board members entitled to qualified immunity in employment discrimination case). And other courts have applied qualified immunity to claims under the Americans with Disabilities Act and other antidiscrimination statutes. *See, e.g.,* Roberts, 723 F. 3d at 973–74 (ADA); Shedlock v. Dep't of Correction, 818 N.E.2d 1022, 1038 (Mass. 2004) (antiretaliation provisions of

ADA); <u>Gonzalez v. Lee Cnty. Hous. Auth.</u>, 161 F.3d 1290, 1299 (11th Cir. 1998) (federal fair housing laws); <u>Mack v. Yost</u>, 63 F.4th 211, 225–26 (3d Cir. 2023) (federal Religious Freedom Restoration Act); <u>Bryant v. Texas Dep't of Aging & Disability Servs.</u>, 781 F.3d 764, 771 (5th Cir. 2015) (federal Family and Medical Leave Act). As the court noted in <u>Mack</u>, "many circuits have applied qualified immunity to individual-capacity suits under a variety of statutes, including the Family and Medical Leave Act, the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Racketeer Influenced and Corrupt Organizations Act, the Sherman Antitrust Act, the Fair Housing Act, and Title VI of the Civil Rights Act of 1964." 63 F.4th at 224 (quotation and citation omitted).

Even though qualified immunity might apply to Counts 1–3, however, it does not require dismissal at this stage because the Complaint sufficiently alleges that the officers did not act in good faith. "Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known." <u>Sabia v. Neville</u>, 165 Vt. 515, 521 (1996). In making this determination, our Supreme Court has adopted the "objective good-faith test" from § 1983 qualified-immunity case law. <u>Id</u>. (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 817–18 (1982). "The outcome of the inquiry depends on the objective reasonableness of an official's conduct, as measured by reference to clearly established law." <u>Id</u>. In the context of state tort liability, the "clearly established law" is "not limited to federal constitutional and statutory rights, but may include Vermont statutes, regulations and common law." <u>Id</u>.

Here, Plaintiff alleges that the officers knew or should have known that J.A. had a disability, and that they were required to accommodate that disability under the VFHPAA. She alleges that the officers neglected to pursue feasible alternatives in handling the encounter with J.A., in violation of departmental policy. She also alleges that

the officers' use of ketamine on J.A., a child, violated the Vermont Statewide Emergency Medical Services Protocols. Compl. ¶¶ 158–61. The officers' conduct needs further factual development to decide whether it was taken in "good faith." *See, e.g.*, Civetti, 2020 VT 23, ¶ 37 ("Whether official qualified immunity provides the Town, standing in the Road Commissioner's shoes, a defense in this case depends on further factual development and cannot be resolved on these pleadings alone."); O'Connor v. Donovan, 2012 VT 27, ¶ 6 n.2, 191 Vt. 412 ("'The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial.' . . . [T]he elements of qualified immunity may [] present fact questions that preclude dismissal or summary judgment.") (quoting Imbler v. Pachtman, 424 U.S. 409, 419 n.13 (1976)). The court has no basis to dismiss any of the claims on qualified immunity grounds at this stage.

Order

Defendant's motion to dismiss is denied. Defendant shall file an Answer within 21 days. The parties shall file a proposed discovery schedule within 30 days thereafter.

Electronically signed on July 31, 2024 pursuant to V.R.E.F. 9(d).

_____
Helen M. Toor
Superior Court Judge